David IANNI, Appellant,

v.

**LORAM MAINTENANCE OF WAY, INC., Appellee.**

No. 08–98–00216–CV.

Court of Appeals of Texas, El Paso.

April 27, 2000.

Rehearing Overruled May 24, 2000.

Gordon Stewart, El Paso, for appellant.

Milton Carey Colia, Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, for appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## O P I N I O N

ANN CRAWFORD McCLURE, Justice.

David Ianni appeals from an order granting summary judgment in favor of Loram Maintenance of Way, Inc. Finding error, we reverse and remand for trial.

### FACTUAL SUMMARY

Loram operates large rail grinding machines which repair and refurbish railroad tracks. The machines reshape the track surfaces and grind the header rail back to the average worn wheel dimensions. Ongoing maintenance is necessary because heavy freight flattens the track. Each grinder is about 600 feet in length and has 88 grinding stones and four V–12 Cummins engines on it. A crew of twelve to fourteen travels with the machine for at least three months at a time, working thirteen- to fourteen-hour days (including travel time to and from the motel), up to six days per week. At the end of each day, the crew stays at a motel paid for by Loram.

Roger Arnold Tingle was employed by Loram as a crew member on one of these grinding machines, referred to in the record as Rail Grinder No. 8, or RG8.[1] While working for Loram, Tingle and his crew (including the foremen) began using crystal methamphetamine (crystal meth) in order to stay awake and alert. Tingle testified that he was once given time off by his supervisors to travel to Barstow, California to obtain more drugs for the crew. The record indicates that Tingle was "out of control," "violent," "going off the deep end," and that his supervisors were aware of the situation. On one occasion, Tingle attacked the wife of another crew member. The incident was diffused when another employee stepped in between Tingle and the woman.

On May 26, 1994, Tingle was strung out on drugs. A coworker told Tingle's supervisor that Tingle was "out of it." Tingle's pupils were dilated to cover his whole iris. One employee described Tingle as slurring his speech and no longer walking upright. He looked exhausted and his eyes were glassy most of the time. After working a fourteen and a half hour day, Tingle returned to his motel in El Paso at approximately 9 p.m. He and his wife began arguing. Tingle then took his wife to a car outside of the motel and threatened her with a gun. She jumped from the moving car screaming for help and was assisted by Ianni, a police officer who was coming out of a local restaurant. As Ianni approached the vehicle, Tingle shot him with a .22 caliber pistol. Ianni's left lung was punctured three times, forcing an air bubble into his brain. He remained unconscious for five days and was unable to return to work for roughly a year.

### THE PLEADINGS

Ianni brought suit against Loram for negligence, alleging:

> "was an experiment ... one of a kind."

---

1. RG8, a California dust grinder machine,

- Loram was negligent in bringing Tingle into El Paso, knowing he was under the influence of mind altering drugs, recklessly disregarding the rights of individuals who would encounter him and consciously imposing an extreme risk of physical injury upon the general public;
- Knowing that Tingle was under the influence of drugs, Loram took no action to control Tingle or obtain help for him;
- Loram allowed Tingle to leave its workplace under the influence of drugs;
- Loram continued to work Tingle when it knew or should have known that Tingle was under the influence of drugs and dangerous to himself and others;
- Loram introduced into El Paso a crew "hooked on drugs, and driven to take more and more of them by their hours of work and nomadic existence;" and
- Loram loosed Tingle on an unsuspecting public, knowing Tingle was under the influence of drugs.

Loram sought summary judgment, alleging that it owed no duty to Ianni,[2] that its conduct was not the proximate cause of Ianni's injuries,[3] and that neither prong of the test for gross negligence is satisfied such that Ianni cannot recover exemplary damages.

In his response to Loram's motion for summary judgment, Ianni restated his theories as negligent retention of an incompetent, unfit, or dangerous employee; negligent supervision; failure to exercise proper control over an employee; and negligent encouragement and aiding and abetting of drug usage. He specifically acknowledged that he was not alleging that the shooting occurred in the course of Tingle's employment.

2. Loram frames the issue as "whether a police officer responding to a domestic dispute involving an off-duty employee is so situated in relation to the assailant's employment that the assailant's employer should reasonably have foreseen the officer's injury." Simply stated, Loram contends that Ianni was not a foreseeable plaintiff within the range of apprehension commensurate with its employment of Tingle. It defines the zone of danger

## STANDARD OF REVIEW

Effective September 1, 1997, the Texas Supreme Court adopted Texas Rule of Civil Procedure 166a(i). Rule 166a(i) provides:

After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

The new rule shifts the burden from the movant, who previously had to establish its right to summary judgment as a matter of law, to the respondent, who now must present sufficient summary judgment evidence to create a fact issue. Two opinions issued by the San Antonio Court of Appeals state the applicable standard of review for no-evidence summary judgments: " 'A no-evidence summary judgment is essentially a pretrial directed verdict,' and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *Taylor–Made Hose, Inc. v. Wilkerson*, No. 04–97–01025–CV, 1999 WL 90021, at *2 (Tex.App.—San Antonio, Feb.24, 1999, no pet. h.), *opinion on reh'g, quoting Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.—San Antonio 1998, writ denied); *see also* Hon. David Hittner & Lynne Liberato, *Summary*

as including Loram and railroad personnel and property.

3. Loram contends that the connection between its conduct and Ianni's injuries are too attenuated to constitute proximate cause because its conduct did no more than furnish the condition that made Ianni's injuries possible.

*Judgments in Texas,* 34 Hous.L.Rev. 1303, 1356 (1998)(no evidence summary judgment is essentially pretrial directed verdict).

A no-evidence summary judgment is properly granted if the non-movant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* Tex.R.Civ.P. 166a(i); *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). If the evidence supporting a finding rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Havner,* 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Taylor–Made,* 1999 WL 90021, at \*2.

A traditional summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Tex. R.Civ.P. 166a(c). The purpose of summary judgment is the elimination of patently unmeritorious claims or untenable defenses; it is not intended to deprive litigants of their right to a full hearing on the merits of any real issue of fact. *Collins v. County of El Paso,* 954 S.W.2d 137, 145 (Tex. App.—El Paso 1997, writ denied); *Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). Unlike other final judgments reviewed on appeal, we do not review the summary judgment evidence in the light most favorable to the judgment of the trial court. *Collins,* 954 S.W.2d at 145; *Continental Savings Association v. Collins,* 814 S.W.2d 829, 831–32 (Tex.App.— Houston [14th Dist.] 1991, no writ). As

explained in *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985), the movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. In deciding whether there is a disputed material fact issue precluding summary judgment, all admissible evidence favorable to the non-movant will be taken as true; every reasonable inference must be indulged in favor of the non-movant and all doubts resolved in the non-movant's favor. *Collins,* 954 S.W.2d at 145.

## DUTY

The common law doctrine of negligence consists of three elements: a legal duty owed; a breach of that duty; and damages proximately resulting from the breach. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Estate of Catlin v. General Motors Corp.,* 936 S.W.2d 447, 450 (Tex.App.—Houston [14th Dist.] 1996, no writ). The threshold inquiry in a negligence action is determining whether the defendant owed a duty to the plaintiff. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995); *Catlin,* 936 S.W.2d at 450. In determining whether to impose a duty, we are to consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor. *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994); *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983).

Ianni contends that Loram assumed the duty to control its employees by transporting them in Loram vehicles, by directing where they stayed, and by paying for their accommodations. He further maintains that Loram then breached this duty because it failed to supervise Tingle even though Loram knew of his drug use and abuse. As a general rule, a person does not have a duty to control the conduct

of another even when the person has the practical ability to do so. *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Catlin,* 936 S.W.2d at 450. However, an employer may be liable for the off-duty torts of its employees which are committed on the employer's premises or with the employer's chattels.[4] *Otis Eng'g,* 668 S.W.2d at 309; *Catlin,* 936 S.W.2d at 450. The duty established in *Otis,* and followed in *Catlin,* exists

> [W]hen, because of an employee's incapacity, an employer exercises control over the employee, the employer has a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent. the employee from causing an unreasonable risk of harm to others.

*Otis Eng'g,* 668 S.W.2d at 311, *citing* RESTATEMENT (SECOND) OF TORTS § 319 (1965)[5]; *Catlin,* 936 S.W.2d at 450. This duty, however, "is not an absolute duty to insure safety, but requires only reasonable care." *Otis Eng'g,* 668 S.W.2d at 311; *Catlin,* 936 S.W.2d at 451. In addition, Texas courts have shown an unwillingness to expand the duty to include situations where the employer either had no knowledge of the employee's condition or did not affirmatively exercise control over the employee. *Catlin,* 936 S.W.2d at 451; *DeLuna v. Guynes Printing Co. of Texas, Inc.,* 884 S.W.2d 206, 210 (Tex.App.—El Paso 1994, writ denied), *citing J & C Drilling Co. v. Salaiz,* 866 S.W.2d 632, 639 (Tex.

App.—San Antonio 1993, no writ); *Moore v. Times Herald Printing Co.,* 762 S.W.2d 933, 934 (Tex.App.—Dallas 1988, no writ); *Pinkham v. Apple Computer, Inc.,* 699 S.W.2d 387, 390 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.); *see also Graff,* 858 S.W.2d at 920; *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990). Before liability will be imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim. *Id.* at 526.

### Summary Judgment Evidence

We turn now to the summary judgment evidence elicited through the following cast of characters. As one might expect, the deposition testimony of the crew members was conflicting, with equal measures of finger-pointing and denials of wrongdoing. We will consider the testimony of each individual in turn. Without question, taken as a whole, it paints a frightening picture of the crew's life on the rails.

### Douglas Grant

Douglas Grant was the human resources manager for Loram. He explained Loram's drug policy, which included pre-employment, for-cause, and random drug testing of employees. He offered a description of the symptoms that ordinarily indicate an employee drug problem, including mood swings, aggressive or argumen-

4. Here, of course, the shooting did not occur on company premises. It did not arise from the use of company chattels. Even if the summary judgment evidence revealed that Loram's supervisors were supplying the crystal meth, Ianni would not be benefited. Consumption of employer-furnished alcohol does not constitute use of the employer's chattels which would subject the employer to liability for negligent use of the chattel by the employee. *Pinkham,* 699 S.W.2d at 391. It is doubtful that company production of other intoxicants would be treated any differently. Further, Tingle was off-duty at the time. Despite Ianni's attempt to characterize company policy as requiring the crew to be available at all times, an employer's requirement that an employee stand on 24–hour call is insufficient

to establish employer liability. There must also be a showing that the employee was at the time of the incident engaged in the furtherance of the employer's business or affairs. *J & C Drilling Co.,* 866 S.W.2d at 637. Such is not the case here since Tingle was transported from the rail site to the motel at the end of his shift.

5. Section 319 of the Restatement provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

tative behavior, dilated pupils, slow work production, or being late for work. Loram also had an employee assistance program, known as the EAR program. Reports of suspected drug usage generally came from a supervisor on-site or from coworkers. The supervisor had authority to pull a worker off the machine and to require a urinalysis or to call the human resources department and ask for guidance. From Grant's perspective, it would never be appropriate for a supervisor to ignore a report of drug use by a crew member or for a supervisor to suspect drug use and not report it in order to avoid downtime on the machine. Grant's office did not investigate the shooting incident and Grant knew of no analysis by Loram as to the reason for the shooting.

### Pat Eischens

Pat Eischens was the regional manager for the rail grinder division. After the shooting, he did not come down to Texas to interview the crew or investigate the shooting. He did talk with some of the men by telephone, but no one ever mentioned drug usage. In fact, he had no information that any crew members had been using drugs. Eischens never talked to Tingle and never made a report to the company concerning the shooting. He acknowledged Loram's policy that "[d]owntime reduces the revenue-generating capacity of the machine and must be kept to a minimum."

### Bernard Soger

Bernard Soger was the highest ranking company official on site and reported directly to Eischens. He became the superintendent of RG8 on January 2, 1994. He described Tingle as a kind, quiet, gentle man and a good welder who operated the machine well and did good quality work.

Loram had a policy prohibiting the use of controlled substances by employees and utilized computerized random drug testing. Soger testified:

Q: As a supervisor what did you understand you were supposed to do to make sure your crew followed this [drug prohibition] policy?

A: Well, like I said, with the urinalysis that was my only tool that I could use to find out for sure if anybody was using drugs. If I felt somebody was having problems on the machine while they're at work, my responsibility was for them during work, if everything was going fine during work I had no problems.

He explained that the company instructed employees to look for specific symptoms of drug usage, such as missing work frequently, poor job performance, slipping from good job performance, being late for the transport truck, or sleeping on the machine. He admitted to using marijuana in the early '80s but denied ever having taken amphetamines or cocaine. He had no personal experience with the symptoms of amphetamine usage.

Soger claimed he had no knowledge of any crew members using amphetamines. He had not heard, from any source, that Tingle had been doing any kind of drug in the cab of the rail grinder. No one told him that Tingle was "cracking up or on drugs." If another crew member had reported to him that Tingle was out of control and using drugs, Soger would not "take what somebody says as fact until I know it for a fact for myself." Instead, he would pay closer attention, watch the situation and if he noticed something wrong, then he would take action. If he had direct evidence of drug usage on the grinder, he would take the crew member off the machine and require a urinalysis.

Q: So you wouldn't consider a member of the crew saying that they or a field clerk or somebody else there saying they think somebody is on drugs, you wouldn't consider that reasonable suspicion to ask for a urinalysis?

A: No, not if their job performance is very well and I notice nothing different about them and they're doing very well I don't see—if there is no proof of any-

thing like that. Hearsay, I can't go by hearsay.

. . .

Q: What I am getting at is why would you want personal knowledge—if you are being real careful why would you not ask for a urinalysis if you had any reasonable suspicion rather than waiting for personal knowledge?

A: I would have to have the reasonable suspicion to—I would have to have some—I'm not going to just give somebody a urinalysis so they can have five days off with pay if I need them on the machine to work and I don't have reason to believe that they're on any kind of drugs.

Soger said that if a crew member tested positive, he would be required to attend a treatment program as a first offense and he would be tested more often thereafter. The treatment program must be completed before the employee could return to work.

Soger did not know of any drug testing of the crew following the shooting. He did not believe it was even discussed.

Q: Was there any reason from your point of view to suggest drug tests right after the shooting of all of the crew or anything like that?

A: No.

Q. And why did you feel that wasn't necessary?

A: The operation of the machine was going smoothly and that's about it, there was no reason that I could see.

On the day of the shooting, Soger was on vacation. Doug Pagliarini was actually the supervisor in charge.

### Doug Pagliarini

Doug Pagliarini substituted for Soger during Soger's vacation. He had tested positive for marijuana at some point during his employment with Loram, but while he was working on a different machine.

He went through a six-week counseling program during which he was allowed to work in the office but not on a machine.

Pagliarini denied having knowledge that anyone on the crew was using speed, uppers, or crystal meth. No crew member ever offered him drugs or talked about any other crew member using drugs. He denied allowing Tingle and his wife to make a side-trip to purchase drugs. He did not even become aware that Tingle had a drug problem until after the shooting and he denied that Dwayne Simpson told him anything about Tingle's drug use.

Pagliarini worked with Tingle the day of the shooting and did not notice anything unusual about him that day. Had Simpson told him that Tingle was out of control, Pagliarini would have brought Tingle in for a urinalysis. He specifically denied having knowledge that Rod Collins had a drug problem.

### Rod Collins

Collins admitted to using crystal meth. He described its effects:

A high amperage effect. It kept you awake. It was a stimulant. It was a mega stimulant. You felt charged—or I felt charged, the ability to do anything, complete things—it sometimes made you feel smarter. It made you feel as though you could—given a task, no matter what, you could complete it.

He was aware that other crew members were using it, including Delbert Singer, Gary Lienard, Don Moser, Nick Kockaniuk, Roger Tingle, and Gary Finholdt. Collins even saw one of the supervisors, Bernard Soger, using crystal meth in one of the motel rooms. He observed Tingle using the drug; in fact Tingle went so far as to use it on the machine. Collins did not report it, even though he knew someone could be killed as a result.

The reason why the crew would not want to report the drug use was because "there was too much at stake."

When you're personally involved in something like that or if you are personally involved in something like that, you wouldn't want to bring anybody else into it either, regardless of who you are. If you were a supervisor, you wouldn't want to bring anybody above you into it. For a supervisor to report that most of the crew were using drugs would hurt the supervisor because it would shut the machine down. Nevertheless, Collins believed the supervisors should have known that Tingle and other crew members were on drugs.

There was no investigation by Loram into the shooting incident. There was no effort to stop the drug usage before the shooting, and no effort to find out about the drug usage after the shooting. Collins never told anyone that he thought Tingle should be drug-tested. Tingle had a supplier—someone he knew in Barstow, California. Collins was involved in one trip to pick up the drugs. Tingle told him that the supervisors had on occasion given him time off to go get the drugs.

### Cheryl Sipper

Cheryl Sipper explained the events in the days leading up to the shooting. She, Doug Fenholt,[6] and Tingle's wife, Patrice, went to Mexico, bought legal drugs and brought them back. Patrice spent all of their money. Tingle found out about it and came after Cheryl with a knife at the Super 8 Motel in Deming, New Mexico. Frank Nickelson, the field clerk, stepped between them, told Cheryl to get in her car and drive to the Best Western in El Paso. Cheryl did not contact the authorities. However, Nickelson was aware of the attack and Cheryl spoke to Nick Kockaniuk about it. She also told Doug Pagliarini about it, although she was not sure how long before the shooting she had spo-

ken with him. Pagliarini told her that he did not want to get involved because he was only there to relieve Soger and would be leaving. She also claimed that Pagliarini was involved in the drug usage. On two occasions, she observed Pagliarini doing "lines" together with Kockaniuk and the Tingles.

The day before the shooting, Patrice called EAR [in Cheryl's presence] to see if she could remove her husband from the machine and place him in detox. "There was no response back." The next morning, Patrice went to Cheryl's room and told her that she was afraid of Tingle, that he "really has gone overboard," and that she needed to get him "off" the machine. They called the Attorney General's office and the Critical Domestic Violence number and were told that only Tingle's supervisor could remove him from the machine. The only supervisor at the motel at the time was Nick Kockaniuk, from the night shift. Cheryl knew his station wagon, found where it was parked, and started knocking on doors until she found him and Doug Fenholt. She took Kockaniuk up to her room to talk to Patrice. Patrice asked him to buy all her compact discs so she could get some money to get away from Tingle. Kockaniuk told her he did not want to get involved. Cheryl and Patrice again called the Attorney General's office and explained that there was no supervisor available. The authorities replied that they could do nothing but they turned it over to a crisis center, who called Cheryl's room to speak with Patrice. They arranged that Cheryl would call Patrice's room at 8 p.m. and if she did not answer, then something was wrong and Cheryl was to call the police. Cheryl believed the crew returned to the motel around 6 p.m., although she was not sure. A little later, the telephone

6. Although it is not clear in the record, the individual Rod Collins called "Gary Finholdt" and the individual Cheryl Sipper referred to as "Doug Fenholt" are likely the same person. For the most part, the crew members of RG8 were no longer working together and proper names of former coworkers were in many instances forgotten. Additionally, the crew members frequently used nicknames, all of which makes it difficult to match names throughout the witnesses' testimony.

rang and it was Patrice. Tingle was screaming in the background.[7] He grabbed the phone away from her, started screaming at Cheryl, and slammed down the phone. The crisis center called Cheryl's room looking for Patrice and Cheryl told them Patrice had gone back to her own room. Cheryl left her room and was going downstairs when she heard Tingle screaming and saw the Tingles get into their car to leave. Then she heard Patrice scream. Cheryl ran back to her room and called the front desk. She then ran over to the Tingles' room, looked inside, and found that it was torn up. At that point, she heard the gunshots. Cheryl talked to Pagliarini that night:

> I told him I was upset. I was furious. I told him that this didn't need to happen. And that if he had just listened and pulled Roger off the machine, there wouldn't be this problem. And he got upset with me and told me that, look if anybody calls you or talks to you, you do not know anything and you don't talk about this. And I told him no, because I was furious. It didn't need to happen.

She also talked with Nick Kockaniuk after the shooting and he felt "incredibly guilty" that he did not do anything when Cheryl went to him the day of the shooting.

Cheryl denied ever having used drugs during this time period. She also said that her husband, Rory, knew about the drug usage among crew members. Finally, Rory told her that Loram's attorneys had indicated "that he [Rory] better get his wife under control and keep her mouth shut."

### Rory Sipper

Rory Sipper testified that in May of 1994, he began to notice that Tingle was "kind of out of it" and somewhat groggy. One time, he caught Tingle sleeping in the cab of the machine and reported it to Pagliarini. Pagliarini told him not to worry about it and that he would take care of it. Although Rory thought Tingle was "glazed, really out of it," he did not specifically mention to Pagliarini that he suspected Tingle might be on drugs. Contrary to his wife's testimony, Sipper denied ever noticing any drug usage by the crew.

### Nick Kockaniuk

Nick Kockaniuk explained that the turnover rate for the company was "real high." "It's a dirty job, long hours, all weather conditions." Generally, the crew was away from home for three months, with two weeks off, and then back to work for an additional three months. Kockaniuk characterized the crew's drug usage as occurring "on occasion," maybe on a Saturday night. He described the company detox program as the "spin dry." Kockaniuk had seen Pagliarini using drugs in a motel room on a few occasions, but he "was more of a pot smoker than a sniffer or a hard-drug user." Kockaniuk admitted he himself had experimented with the crystal meth a few times.

Kockaniuk commented that the crew called Tingle "Happy Bear" because he was a big guy with a beard. He was friendly and easygoing. After he began using crystal meth, Tingle became jumpy and jittery, edgy, and fairly excitable. He lost well over forty pounds. By late May, Tingle was getting worse. He was missing work, calling in sick, and his work performance was in decline. On the evening of the shooting as Tingle was coming off his shift, he had a hollow look in his eyes and was staring out in space. "His pupils were dilated to cover his whole iris." Kockaniuk had never observed Tingle doing drugs on the machine but he noticed that Tingle and his wife were arguing more. He suggested they try to wean themselves off the drugs or take a vacation. In his view, the drugs were affecting Tingle's job performance and the safety of crew members.

---

7. Cheryl explained why Tingle was angry with Patrice at the time of the shooting. Patrice had cleaned the motel room, taken all of the drugs and paraphanalia, taped it underneath the bathroom vanity where he could not find it, and refused to give it to him.

Despite that fact, Kockaniuk never discussed Tingle with either Soger or Pagliarini.

### Dwayne Simpson

Dwayne Simpson denied any personal drug usage, but he admitted having participated in the detox program due to alcohol abuse. Drugs were "readily available at any given time," "just like cigarettes." Simpson observed Tingle's drug use, but in his version, Tingle was using drugs on the job:

> He came in one day to the 'B' cab, which is the secondary command point in the operations of the machine, and he dumped out a quantity of meth, speed, whatever it is, on the machine console and did it up right in front of me, and then turned around and rolled up on the floor and went to sleep. That's—what's to say beyond that? That's when I got scared.

This incident occurred some two or three days before the shooting. Simpson went to talk to Pagliarini that night and told him:

> 'You need to do something about Roger. He's—he's going off the deep end,' or something to that fact. Basically, I told him, 'he's—he's using drugs and he's—he's not normal, and you need to do something about it.'

Pagliarini responded that he would look into it. As a result of that conversation:

> The next day Roger Tingle came into 'B' cab and was pretty hostile at me, saying that I narced on him—like did I call the office or whatever and turn him in, and I said, 'No, I talked to [Pagliarini] about it.' And I said, 'You've got a problem, Roger. And you know it and I know it. Look what you did, you know, the day before.' And he was so—so removed from his senses that he just blew up.

Simpson related that on the day of the shooting, Tingle and his wife had an argument and Tingle was mad all day. He was threatening to kill her and to "beat her up." After the shooting, Pagliarini told Simpson and the other crew members that they were to say that he [Pagliarini] knew nothing about the drug problem. Within a few days, Eischen conducted an interview with the crew over the cellular phone and everyone fell in line, saying "that they didn't know nothing about nothing." Loram did nothing else, "not even a drug test," although the entire crew expected one. Simpson admitted having "blackmailed" Loram, threatening to testify if they did not give him his job back.

### Roger Tingle

Excerpts of Tingle's testimony at the punishment phase of his criminal trial are included in the summary judgment record. By that time, Tingle and Patrice were separated. In his view, a standard Loram workweek averaged at least eighty hours, excluding the travel time to and from the machine. Although days off were scheduled weekly, the crew did not get them on a regular basis. Sometimes the workers went weeks without time off.

> If the crew was short, somebody didn't come back from vacation or something, they were shorthanded. They had to have a crew operate, so you just have to work.

He explained that crew members frequently went on vacation "and you'd never see them again." During the months preceding the shooting, Tingle was not getting his days off.

He also described his relationship with Patrice. Early on, they handled life on the rails "pretty good." Patrice was traveling with him over 90 percent of the time. In early 1994, things began to change. They had begun using drugs and Patrice wanted to control the crystal meth, wanting "to hand them out to me, to tell me what I could do and what I could not do." When the crew would move, Tingle would travel on the train and Patrice would drive to the next hotel. She did not trust him with the drugs. Although he carried them in a

briefcase on the train, the briefcase was locked and Patrice kept the key.

He also described the crew's drug usage:

Q: Would you describe the effects crystal methamphetamine would have on you?

A: When I first started taking it, you don't really feel a high from it. You are able to work all day or all night. You are not tired. You are not worn out and have to hit the hay. You feel you got energy all of the time.

Q: Over time what effect would it have?

A: Over time, it will make you psychotic, and you don't realize things. You can see other people, them messing up, and you wonder, 'Why are they messing up like this? It don't bother me.'

Q: Why was the crew taking crystal methamphetamine?

A: The hours that we worked, just try to keep an edge on things, stay awake and alert. You are not wore out, just—well, you are not tired. You've got energy.

Q: Were other people on the crew using the crystal meth?

A: Yes, sir.

Q: Who?

A: Myself, Rod Collins, Nick Kockaniuk. There was Doug Pagliarini [sic] was the foreman. There was Bernie Soger, he was also a foreman, and Harry Miller.

Q: Was most of the crew using?

A: Yes, sir, probably at least three-fourths.

· · ·

Q: Did the crew start getting this through a bar in Barstow?

A: Yes, sir.

Q: Patrice had met somebody?

A: Met a woman in a bar, yes, sir.

Q: As the crew got further away from Barstow, were you and Patrice given time to go back and get it for the crew?

A: Yes, sir.

Q: Why?

A: Well, we needed it to be able to get up and go to work. If we didn't have it, everybody would not be able to get up and go.

Q: Had it gotten that bad?

A: Yes, sir.

The situation worsened around the end of April or the first of May. The quality of work was "going downhill." When Tingle got to New Mexico, he went across the border to buy Valium and to bring him down so he could sleep. He could not remember when the crew moved to El Paso or how many days they were there. He believed he had been awake for four or five days and his body "was in bad shape." Not only was the night of the shooting unclear to him, he did not "recollect too much about the whole month."

Following the shooting, Tingle remained in jail for nine weeks. Upon his release, he completed a drug rehabilitation program and has since abstained from drugs and alcohol. He pled guilty to attempted capital murder of a police officer. The record does not reveal the punishment imposed.

### Was There an Affirmative Act of Control?

 While Tingle's supervisors knew of his drug abuse and knew that he was incapacitated at the time of the shooting, in order for a duty to third persons to arise, an employer must perform some affirmative act of control over an "incapacitated employee." *Catlin*, 936 S.W.2d at 451; *DeLuna*, 884 S.W.2d at 210; *Moore*, 762 S.W.2d at 934. What constitutes affirmative acts? In *Otis*, the defendant acted affirmatively in sending the drunken driver home and creating a dangerous situation by putting him behind the wheel of his car. And in *El Chico*, the defendant acted

affirmatively in continuing to pour the alcohol into an intoxicated patron, knowing the patron would have to drive home.

 Taking the summary judgment evidence as true, which we must, Loram arguably created a dangerous situation [the rigorous working environment] and facilitated the drug usage of crew members to enable them to endure the rigorous working environment. However, mere creation of the dangerous situation is insufficient. *Jenkins v. Kemlon Products & Development Co.*, 923 S.W.2d 224, 227 (Tex.App.—Houston [14th Dist.] 1996, no writ). Is facilitating drug usage an affirmative act of control over an incapacitated employee? In other words, may an employer be found liable for feeding an employee's drug habit in order to maximize the employee's work performance? We look to the intoxication cases for guidance.

*Otis Eng'g* involved a wrongful death action instituted by Larry and Clifford Clark against Otis Engineering Corporation after the Clarks' wives were killed in an automobile accident involving an Otis employee, Robert Matheson. Matheson had a history of drinking on the job and he was intoxicated on the night of the accident. During his dinner break, he went to the parking lot and consumed alcoholic beverages in his car. A coworker knew of the drinking problem and told Matheson's supervisor that Matheson was slurring his speech, that he was uncoordinated, that he was not acting right, and that "we need to get him off the machines." Another coworker explained that Matheson's complexion was blue, he was bobbing and weaving on his stool and about to fall into his machine. The supervisor suggested that Matheson go home, escorted him to the company parking lot, and asked if Matheson could make it home. Matheson said that he could. The traffic accident occurred thirty minutes later, three miles from the plant. Matheson's blood alcohol content was 0.268 percent. The evidence indicated that the supervisor knew that Matheson was in no condition to drive, and

that when some night shift employees came on duty talking about an accident, the supervisor was afraid Matheson might have been involved, so much so that he voluntarily went to the police station to inquire. In reversing summary judgment, the Supreme Court noted fact issues were raised as to the reasonableness of Otis' conduct once it asserted some control over its incapacitated employee. *Otis Eng'g*, 668 S.W.2d at 311. The duty was not imposed "because of the mere knowledge of the intoxication, but because of the employer's *negligent exercise of control* over the employee." [Emphasis in original]. *Greater Houston Transp.*, 801 S.W.2d at 526.

In *Catlin*, an employee of Fluor Daniel, Inc., Edison Davis, became intoxicated at a company fish fry held for company employees on company property following a softball game. The party began around 4:30 in the afternoon. While the employee who had planned the fish fry left the party around 8:30, other employees stayed until late in the evening, drinking "lots of beers and hard liquor." Davis and a coworker then left the party and headed to a bar, where they stayed until closing time. After leaving the bar, Davis collided with Mary Catlin's automobile, causing Catlin's death. Fluor Daniel successfully urged on summary judgment that it did not owe a duty to the unknown third party. Catlin's estate argued that the company had used its special relationship of employer-employee to control the activity of employees on company property. In short, the estate contended that the company assumed a duty because it instituted a plan to control the consumption of alcohol on company premises and at company-sponsored events and that it had breached the duty by failing to comply with the policies and procedures which had been implemented.

On appeal, the appellate court concluded that there was no indication that Fluor Daniel or its employees knew that Davis was intoxicated to the point of incapacity. *Catlin*, 936 S.W.2d at 451. Further, Fluor

Daniel's activities did not constitute an attempt to control the employees.

> We conclude that the mere creation of an internal policy regarding consumption of alcohol on the premises, whether or not the fish fry was a 'company function,' does not create a duty as set forth in *Otis*. More is required. In *Otis*, the employer had *actual knowledge* of the intoxication and then performed *an affirmative act of control*. These elements are not present in this case. [Emphasis in original]. ·

936 S.W.2d at 451.

This Court has previously considered the issue in *DeLuna*, where an off-duty employee, having left work for the day, consumed alcohol in a parking lot on or adjacent to company property and was thereafter involved in an automobile accident on a public street. Summary judgment was granted to the defendant on the grounds that the employee was off-duty at the time of the accident, that the accident occurred hours after his work shift had ended, and that he was driving his own automobile for personal purposes. The plaintiff countered that he had alleged a cause of action based on RESTATEMENT (SECOND) OF TORTS § 317 (1965) and that a fact issue existed as to whether the defendant had a duty to control the conduct of its off-duty employee. In affirming, this Court, in a divided opinion, concluded that "[i]t is apparent that if Texas recognizes a Section 317 cause of action, it is only in a limited sense that in order for a duty to arise, the employer must not only have some knowledge of the employee's condition or incapacity, but must exercise some control or perform some affirmative act of control over the employee." *DeLuna*, 884 S.W.2d at 210. In finding no duty, the majority noted that the employee had no history of abusing alcohol on or off the job, that the employer had no knowledge that the employees were drinking beer on or near company premises, and that the employer took no affirmative action to control the employee. *Id.*

Justice Larsen dissented, commenting first that the Texas Supreme Court has twice specifically recognized Section 317 as Texas law. *Id.* at 211. Secondly, she concluded that there were genuine issues of material fact inasmuch as the summary judgment evidence indicated that the parking lot was a common area under the employer's control, that the employer had the ability to control the negligent employee, and that it knew or should have known of the necessity and opportunity for control. *Id.* at 212.

> For example, there was evidence. that after-work beer parties in the Guynes parking lot, if not a habitual occurrence, were at least common. There was evidence that at least one supervisor was at the print shop during the time the. beer drinking was taking place in the parking lot. There was evidence that an employee with some supervisory duties was even a participant in the party on the afternoon in question. There was evidence that Guynes' landlord had requested that Guynes put up signs regarding drinking on the premises, and Guynes did so, thus creating the inference that both knew drinking on-premises was a potential problem.

*Id.*

And while *El Chico* is not an employer-control case, it nevertheless enunciates a simple wisdom of foreseeability that is oft repeated for its searing imagery:

> The risk and likelihood of injury from serving alcohol to an intoxicated person whom the licensee knows will probably drive a car is as readily foreseen as injury resulting from setting loose a live rattlesnake in a shopping mall.

*El Chico Corp.*, 732 S.W.2d at 311.

We have already referenced via footnote Loram's duty rule—"An employer owes no duty of care to a police officer injured while responding to a domestic dispute involving an off-duty employee. This is so because the officer is not within the range of apprehension commensurate with the

employer's employment of the employee." In short, Loram claims the zone of danger would include Loram employees and would extend to railroad personnel and property. But Ianni was a third person attempting to rescue Patrice, just as Cheryl Sipper was attacked because of Patrice's involvement with her. Loram's supervisors not only knew of Tingle's drug usage, they engaged in it with him. Tingle was granted time off, a rarity in the months before the shooting, in order to obtain drugs, not only for himself but for the rest of the crew. At least three-quarters of the crew were relying upon the drug to meet the grueling hours and working conditions.[8] The knowledge by the supervisors of employee drug usage and the drug usage by the supervisors themselves created a dangerous situation. When Tingle's behavior worsened and the supervisors were warned of the growing danger, they did nothing. However, when Tingle attacked Cheryl Sipper, the field clerk intervened and directed Cheryl to leave Deming and drive on to El Paso, where the crew was headed next. His efforts to control Tingle's behavior removed Cheryl from the scene but did nothing to protect other innocent individuals who happened into Tingle's path. Here, the rattlesnake was not only set loose, it was coiled and had already struck once. Despite that knowledge, Loram allowed it to strike a second time. We conclude that summary judgment on this ground was improper.

### CAUSATION

■ Loram additionally sought summary judgment alleging there was no evidence that Tingle's use of drugs, whether or not condoned by Loram, was a substantial factor in bringing about Ianni's injuries. Specifically, the motion for summary judgment argued that "all the evidence in this case points toward a domestic dispute between Mr. Tingle and his wife as being the cause-in-fact of the shooting." Re-

turning to the foreseeability argument that was urged in connection with the issue of duty, Loram also contended that Ianni had "no evidence that a person of ordinary intelligence would have anticipated that Mr. Tingle would shoot the Plaintiff. In fact, all the evidence in this case shows Mr. Tingle was a kind, gentle and quite [sic] man with no known prior history of violent tendencies." On appeal, Loram maintains that summary judgment was proper because the nexus between Loram's employment of Tingle and Ianni's injury was, as a matter of law, too attenuated to constitute proximate cause because "[i]njury to a police officer responding to a domestic dispute involving an off-duty employee is not a normal, substantial part of the risk which a reasonable employer would recognize as fairly to be taken into account in implementing a substance abuse policy applicable to employees in safety-sensitive positions." Instead, Loram argues, the foreseeable risk in such a case is job-related injury or damage to persons and property. On these facts, we disagree.

■ We readily recognize that legal cause is not established if the defendant's conduct does no more than furnish the condition that makes the plaintiff's injury possible. *Union Pump Company v. Allbritton,* 898 S.W.2d 773, 775–76 (Tex.1995). Nor is it sufficient that the harm would not have occurred had the defendant not been negligent; the negligence must be a substantial factor in causing the plaintiff's injury. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 (Tex.1991). Thus, if the evidence were limited to the fact that Loram was responsible for bringing Tingle into El Paso, and that Tingle would not otherwise be in El Paso, we would be inclined to agree. We might even agree if the evidence established that despite rampant drug usage by crew members, on-site supervisory personnel were not aware of the drug usage by the crew in general

8. Tingle commented that in the month before the shooting, the temperature reached 112

degrees. The crew was suffering from the heat and "the work had fallen off a lot."

nor by Tingle in particular. Taking the summary judgment evidence as true, which we must, we find it creates a genuine issue of material fact as to both cause-in-fact and foreseeability. We are not to be understood as holding that Loram is an insurer for injuries sustained by any person who by happenstance crossed the path of an employee. However, Loram supervisors knew of the crew's drug usage, aided the crew in procurement of the drugs, failed to require drug testing in the face of policy violations, failed to remove Tingle from the work site despite requests to do so, and brought Tingle into El Paso shortly after an unprovoked attack on a nonemployee who was attempting to assist Tingle's wife. On the day of the attack on Ianni, Tingle was visibly impaired both on the job site and afterwards. We are not inclined to limit foreseeability of this vicious attack to the point in time when Tingle clocked out and was deposited at the motel. While Loram is certainly fortunate that no incident occurred on the job site causing injury to Loram employees, railroad personnel, or innocent passengers, it cannot cross its fingers and proclaim "we couldn't see it coming." If Loram did not see it coming, it was because it chose not to see. Closing one's eyes does not negate foreseeability. As for cause-in-fact, the summary judgment evidence reveals a harsh working environment, grueling hours, little time off (if any), widespread drug usage by the crew facilitated by supervisory personnel (all three of whom participated in its usage), a company policy of drug testing in tension with a policy of minimizing machine downtime, an employee exhibiting classic symptoms of a drug problem, and an action by a supervisor in diffusing a violent attack by an employee upon a non-employee not by removing the employee from the job and requiring drug testing, but by sending the targets, Cheryl Sipper and Patrice Tingle, ahead to El Paso where they were later joined by Tingle.

We understand Loram's argument concerning the domestic violence which simmers at the core of this controversy. One might wonder why Patrice stayed knowing of Tingle's violent tendencies. We do not have the benefit of Patrice's testimony and there is nothing in the record relating to the dynamics of domestic violence. For summary judgment purposes, however, we must take as true Cheryl Sipper's testimony that Patrice was trying to get away and that she wanted to sell her compact discs to a Loram supervisor to get enough money to leave: [9]

> The only supervisor that was at the motel, the Best Western at the time was the night—was Nick Kockaniuk. I called the front desk, I was not abe [sic]—they would not put me through to Nicks [sic] room, because they're night workers and he had a block. So I went down to where I knew Nick's station wagon was parked and started knocking on all the doors until I found Doug Fenholt and Nick and brought Nick back up to my room and he spoke to Patrice.
>
> Patrice asked him at that point to buy all her CDs to give her money, because she needed to get away from Roger, because she was really frightened and she didn't want to be there when he got off the machine.
>
> Nick said no, he didn't want to get involved. That was a personal matter between Roger and Patrice and he didn't want to do anything behind Roger's back. And that Patrice was going to have to stay there and just stay out of Roger's way and be calm and pacify him until it blows over; that he would get better.

On cross-examination, Cheryl answered more bluntly:

> Q: Why didn't Patrice just leave?

---

9. Nick Kockaniuk also testified that Patrice tried to sell him her CDs so that she could leave town.

A: She didn't have any money.

Q: Well, if you were so concerned about her, you would have lent her the money; wouldn't you?

A: I didn't have any left.

While Loram intervened to get Cheryl away from Tingle after the attack in Deming,[10] it required that Patrice stay and wait until "it blows over." The shooting happened hours later. Once again, the victim was an individual who tried to help Patrice.

## GROSS NEGLIGENCE

Lastly, Loram sought summary judgment on the basis that Ianni could not recover exemplary damages because Loram was neither negligent nor grossly negligent. We have already determined that a fact issue exists with regard to Loram's negligence. We turn now to the question of whether a fact issue exists concerning Ianni's claim that Loram was grossly negligent. We begin with *Moriel.*

■■■ In *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994), the Texas Supreme Court formulated a two-pronged test for establishing gross negligence. First, the defendant's act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Second, the defendant must have actual subjective awareness of the risk involved but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Moriel,* 879 S.W.2d at 22. Only if the act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent. *Id.* It is the subjective conscious indifference which distinguishes gross negligence from ordinary negligence. *Uniroyal Goodrich Tire Co. v. Martinez,* 928 S.W.2d 64, 71 (Tex.App.—San Antonio 1995), *aff'd,* 977 S.W.2d 328 (Tex.1998). Where exemplary damages are sought against a corporate entity, there must be a showing that someone employed in a managerial capacity and acting in the scope of that managerial capacity was grossly negligent. *Dalworth Trucking Co. v. Bulen,* 924 S.W.2d 728, 732–33 (Tex.App.—Texarkana 1996, no writ), *citing King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950).

### *Extreme Degree of Risk*

■■■ We recognize that the first prong of *Moriel* is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury. *Moriel,* 879 S.W.2d at 22. We have already detailed the various versions of events as told by the crew. We summarize it here, focusing on the specific conduct of the three supervisors.

The rail grinding machines were inherently dangerous, as Bernard Soger explained:

> Well, passing trains was a big thing. Say we went in the clear, trains go by you 50, 60, 70 miles an hour, you have to be very careful. The operator has to pay close attention to switches and crossings so you don't hit cars, signals. One fatal mistake could be fatal, I mean you pull out in front of another train or something like that. Just the machine itself, you know, there was a lot of the safety involved. Those stones are still spinning very fast after they are shut off to change them, a lot of big engines on there with fans and belts.

Because of the safety sensitive positions in the organization, the company formulated a drug policy "for the purpose of making sure that our work force was drug free and working safely .... and that they are able to perform their work without possibly putting themselves or others in peril." The company believed that the use of illegal drugs would compromise safety.

---

10. Cheryl's precise testimony was that "Frank Nickelson stepped in between us, told me to get in my car and to drive to the Best Western in El Paso. And he would get my belongings out of the hotel room."

According to the human resource manager, it would never be appropriate for a supervisor to ignore a report of drug use by a crew member or for a supervisor to suspect drug use and not report it. Yet Soger acknowledged that even if a crew member had reported employee drug usage, Soger would not take action unless he knew it for a fact himself. Instead, he would "pay closer attention" and watch the situation. His motivation in not "going by hearsay" was clear. "I'm not going to just give somebody a urinalysis so they can have five days off with pay if I need them on the machine to work and I don't have reason to believe that they're on any kind of drugs." Indeed, according to Rod Collins, for a supervisor to report drug usage by the crew would result in a machine shut down. Thus, a supervisor would not want to bring anyone "above" him into the situation. And apparently, none of the three supervisors here did. There is no evidence that either Pat Eischens or Douglas Grant knew of the rampant drug usage; nor is there any evidence that they inquired even after the shooting.

However, as on-site supervisors in a managerial capacity, Soger's, Pagliarini's, and Kockaniuk's handling of the drug problems implicates Loram. All three were using drugs themselves. Rod Collins implicated Soger and Kockaniuk. Cheryl Sipper fingered Pagliarini and Kockaniuk. Kockaniuk candidly admitted it. Kockaniuk was notified of Tingle's drug problem by Cheryl and Patrice. Pagliarini was notified by Cheryl and Dwayne Simpson. Pagliarini had also been told by Rory Sipper that Tingle had fallen asleep on the job, a specific symptom of drug usage for which Soger admitted supervisors had been instructed to look. Pagliarini and Kockaniuk had been told about Tingle's unprovoked attack on Cheryl in New Mexico. Despite this knowledge, they did not notify upper management. They did not pull Tingle off the machine or send him for drug testing. And despite the fact that Cheryl—a third person caught up in trying to protect Patrice—was temporarily extricated from Tingle's attack, they refused to help Patrice, instructing her "to stay there and just stay out of Roger's way and be calm and pacify him until it blows over." The combination of these actions exploded in David Ianni's chest. Tingle remained on the scene in a drug-dazed condition. Patrice was unable to get away. And yet another third person who came to rescue Patrice was attacked as Cheryl Sipper had been a short time before. Their conduct raises a genuine issue of material fact as to whether they acted with an extreme degree of risk to anyone who happened into Tingle's path, be it Loram employee, railroad personnel, railroad passengers, or innocent bystanders.

### Conscious Indifference

The second prong of *Moriel* requires that the defendant have actual subjective awareness of the risk involved but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Moriel*, 879 S.W.2d at 22. Kockaniuk certainly was aware of the risks involved in drug usage by the rail crew. In fact, he ultimately left Loram because

I thought there was—the conditions were unsafe, and I felt, hazardous to my own health, so I quit and jumped on Amtrak and went home. . . . I found a syringe. I was running the night crew and I found a syringe. And suspected there was people on my crew and on the crew of RG8 that were using drugs, and I was worried about my own safety because of the hydraulics and whatnot— very easily hurt. Say I'm working on something and somebody hits a switch or turns a pump on, and I'm working on something and I get squished or smashed or something like that.

Kockaniuk also knew of Tingle's drug usage and approached him at least once.

He was having trouble. He couldn't do his job like he should have been able to do his job. I suggested to him to try and wean off whatever he was on, more than one occasion—wean himself off. I

didn't know what he was using or what he was doing. I just know he was doing something that was detrimental to himself *and to people around him.* [Emphasis added].

Tingle had also had one prior accident arising from his welding job.

He was welding in the caboose, and started the caboose on fire. He was welding a door hinge on or a frame around the door or something. He started the back—it had foam kind of backing, like say on a chair or something, caught fire and smoked up the caboose—burned it up pretty bad.

Kockaniuk and Pagliarini knew of the attack on Cheryl Sipper and knew that Patrice was frightened and wanted Tingle pulled off the machine. This evidence gives rise to a fact issue as to whether they had actual subjective awareness of the risk involved but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others. Accordingly, summary judgment was improper on this ground.

We conclude that Ianni has established that summary judgment was improper on all grounds alleged. His sole issue for review is sustained. The judgment is reversed and remanded for trial on the merits.