COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

LORAM MAINTENANCE OF WAY,
INC.,      )

                                                                              )              
No.  08-02-00049-CV

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )               
120th District Court

DAVID IANNI,                                                    )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )                     (TC# 96-151)

                                                                              )

 

 

O
P I N I O N

 

Appellant Loram
Maintenance of Way, Inc. (ALoram@) appeals from a judgment in which the
jury found in favor of Appellee David Ianni in his negligence suit.  On appeal, Loram asserts that, as a matter of
law, it owed no duty of care to Mr. Ianni and challenges the legal and factual
sufficiency of the evidence to support the jury=s
findings of proximate cause and gross negligence or liability for punitive
damages.  We affirm.

FACTUAL
AND PROCEDURAL BACKGROUND








Headquartered in
Minnesota, Loram is a company that operates large rail grinding machines that
repair and refurbish railroad tracks.[1]  A crew of twelve to fourteen employees travel
with a machine for about three months at a time, working thirteen to fourteen
hour days (including travel time to and from the motel), up to six or seven days
per week.  At the end of each day, the
crew and their female companions stay at a motel paid for by Loram.  Roger Tingle, a crew member of Rail Grinder
No. 8, or RG8, and his crew began using crystal methamphetamine in order to
stay awake and alert.  According to Mr.
Tingle, at one time, he was given time off by his supervisors to obtain more
drugs for the crew.

On May 26, 1994,
Mr. Tingle was strung out on drugs. 
During the prior week, fellow employees described him as having slurred
speech, no longer able to walk upright, appearing exhausted, and
glassy-eyed.  After working over twelve
hours that day, Tingle returned to his 
motel in El Paso.  Mr. Tingle and
his wife Patrice began arguing in their motel room.  He took her to a car outside the motel and threatened
her with a gun.  She jumped from the
moving car, screaming for help.  Mr.
Ianni, a police officer, was coming out of a local restaurant.  As Officer Ianni approached the vehicle, Mr.
Tingle shot him with a .22 caliber pistol. 
Officer Ianni sustained severe injuries from the gunshot wounds and was
unable to work for almost a year.  (Mr.
Tingle pled guilty to the offense of attempted capital murder and was sentenced
to ten years=
imprisonment.








Officer Ianni
brought suit against Loram, alleging that it was negligent under the following
theories:  (1) negligent retention of an
incompetent, unfit, or dangerous employee; (2) negligent supervision; (3)
failure to exercise control properly over an employee (and his wife); and (4)
negligent encouragement and aiding and abetting of drug use.  Loram sought summary judgment, alleging that
it owed no duty to Officer Ianni, that its conduct was not the proximate cause
of Mr. Ianni=s
injuries, and that Officer Ianni could not recover exemplary damages under the
test for gross negligence.  The trial
court granted summary judgment in favor of Loram.  This Court reversed the summary judgment and
remanded this cause for a trial on the merits. 
See Ianni v. Loram Maintenance of Way, Inc., 16 S.W.3d 508
(Tex.App.--El Paso 2000, pet. denied) (AIanni
I@).  After the trial, the jury found in favor of
Officer Ianni, specifically finding that Loram proximately caused Officer Ianni=s injuries and was grossly negligent,
and awarded to Officer Ianni $800,000 in actual damages and $500,000 in
punitive damages.  Loram now brings this
appeal.

DISCUSSION

The common law
doctrine of negligence consists of three elements: a legal duty owed; a breach
of that duty; and damages proximately resulting from the breach.  D. Houston, Inc. v. Love, 92 S.W.3d
450, 454 (Tex. 2002); El Chico Corp. v. Poole, 732 S.W.2d 306, 311 (Tex.
1987); Estate of Catlin v. General Motors Corp., 936 S.W.2d 447, 450
(Tex.App.--Houston [14th Dist.] 1996, no writ). 
Proximate cause consists of two elements: (1) cause in fact and (2)
foreseeability.  Doe v. Boys Clubs of
Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995).  

DUTY








In Issue One,
Loram asserts that it owed no duty of care to Officer Ianni as a matter of
law.  Specifically, Loram argues inter
alia that Officer Ianni was not a foreseeable plaintiff within the range of
apprehension commensurate with Mr. Tingle=s
employment, which in this case is Athat
an employee in a safety sensitive position would cause personal injury or
property damage on the job.@  Loram contends that imposing duty in this
instance would be tantamount to making an employer the insurer of the safety of
all who come into contact with its employee simply based on that individual=s status as an employee.

Duty is a
threshold inquiry in a negligence action. 
Thapar v. Zezulka, 994 S.W.2d 635, 637 (Tex. 1999); Centeq
Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).  The existence of a legal duty is a question
of law for the court to decide from the particular facts surrounding the
occurrence in question.  Van Horn v.
Chambers, 970 S.W.2d 542, 544 (Tex. 1998); City of McAllen v. De La
Garza, 898 S.W.2d 809, 810 (Tex. 1995). 
We review the trial court=s
determination of duty on a de novo basis.  See El Paso Natural Gas Co. v. Minco Oil
& Gas, Inc., 8 S.W.3d 309, 312 (Tex. 1999).  In determining whether to impose a duty, we
are to consider the risk, foreseeability, and likelihood of injury weighed
against the social utility of the actor=s
conduct, the magnitude of the burden of guarding against the injury and the
consequences of placing that burden on the actor.  Bird. v. W.C.W., 868 S.W.2d 767, 769
(Tex. 1994); Otis Eng=g
Corp. v. Clark, 668 S.W.2d 307, 309 (Tex. 1983).








Generally, a
person does not have a no duty to control the conduct of an another.  See Graff v. Beard, 858 S.W.2d 918,
920 (Tex. 1993); Otis Eng=g
Corp., 668 S.W.2d at 309.  However,
an employer may be liable for the off-duty torts of its employees when, because
of an employee=s
incapacity, an employer exercises control over the employee.  Otis Eng=g
Corp., 668 S.W.2d at 311, citing Restatement
(Second) of Torts '
319 (1965).  Under such circumstances,
the employer has a duty to take such action as a reasonably prudent employer
under the same or similar circumstances would take to prevent the employee from
causing an unreasonable risk of harm to others. 
Otis Eng=g
Corp., 668 S.W.2d at 311.  This duty,
however, Ais not an
absolute duty to insure safety, but requires only reasonable care.@ 
Id.  Texas courts have
shown an unwillingness to expand the duty to include situations where the
employer either had no knowledge of the employee=s
condition or did not affirmatively exercise control over the employee.  See Greater Houston Transp. Co. v.
Phillips, 801 S.W.2d 523, 526-27 (Tex. 1990); Estate of Catlin v.
General Motors Corp., 936 S.W.2d 447, 451 (Tex.App.--Houston [14th Dist.]
1996, no writ); DeLuna v. Guynes Printing Co. of Texas, Inc., 884 S.W.2d
206, 210 (Tex.App.--El Paso 1994, writ denied) (in order for a duty to arise,
the employer must not only have some knowledge of the employee=s condition or incapacity, but must
exercise some control or perform some affirmative act of control over the
employee).  








Evidence in this
case showed that while Superintendents Bernard Soger and Doug Pagliarini denied
using amphetamines and stated they had no knowledge of any crew members using
drugs, several crew members and the wives offered contrary evidence.[2]  Crew member Roderic Collins  testified that he was aware of other crew
members (including Mr. Tingle) using illegal drugs and had seen Mr. Soger using
crystal methamphetamine in one of the motel rooms.  Mr. Collins observed Mr. Tingle using crystal
methamphetamine, even while operating the machine.  He did not tell any supervisor or co-worker
because everyone else knew about Mr. Tingle=s
drug use and were also helping themselves to the drugs.  Crew member Dwayne Simpson testified that he
observed Mr. Tingle using drugs on the job a few days before the shooting and
went to talk to Mr. Pagliarini about it. 
Cheryl Sipper claimed that Mr. Pagliarini was involved in the crew=s drug usage and on two occasions in
January 1994, she observed him doing Alines@ with night shift leadman Nikolas
Kockaniuk and the Tingles.[3]  Mr. Kockaniuk testified to seeing Mr.
Pagliarini using drugs in a hotel room.

According to Mr.
Tingle, at least three-fourths of the crew was using crystal meth, including
Mr. Collins, Mr. Kockaniuk, Mr. Pagliarini, and Mr. Soger.  Mr. Tingle stated that the crew was taking
crystal meth in order to stay awake and alert. 
According to Mr. Tingle, Mr. Pagliarini had given him time off to
get drugs for the crew in Barstow, California. 
On occasion, Mr. Pagliarini was 
present when Mr. Tingle was using crystal methamphetamine and at one
point gave him some of the drug when he was out.  In addition, Mr. Pagliarini had observed Mr.
Tingle in an incapacitated state at work because of his drug usage.  On that day, Mr. Tingle was not able to
function at work and slept on the floor of the cab for about half the day.  Mr. Pagliarini knew that Mr. Tingle=s conduct was a result of the speed
leaving his system.  Mr. Pagliarini
warned him about it because he was not able to do his job that day, but
Mr. Pagliarini did not take further action.








Mrs. Sipper
testified about the events leading up to the shooting, in particular, she
recounted that Mr. Tingle tried to attack her with a knife at the motel in
Deming, New Mexico.  Loram=s field clerk Frank Nicholson stepped
between them and told Mrs. Sipper to get in her car and drive to the Best
Western in El Paso, where the crew was headed next.[4]  This occurred some days before the
shooting.  His efforts to control Tingle=s behavior was to remove Mrs. Sipper
from the scene, but did nothing to protect other innocent individuals who
happened into Mr. Tingle=s
path.  Mrs. Sipper told Mr. Kockaniuk and
Mr. Pagliarini about the attack.[5]  In addition, Mr. Simpson had warned Mr.
Pagliarini that Mr. Tingle=s
behavior was worsening and that he needed to do something about it.  We conclude that a duty was imposed on Loram
not because it had mere knowledge of Mr. Tingle=s
encouraged drug usage and altered state of mind, that is, his incapacity, but
because of its negligent exercise of some asserted control over Mr. Tingle
once Loram supervisors acted affirmatively to prevent Mr. Tingle from causing
an unreasonable risk of harm to others.  See
Otis Eng=g Corp.,
668 S.W.2d at 311; Greater Houston Transp. Corp., 801 S.W.2d at 526
(discussing the duty imposed on the employer in Otis Eng=g Corp. v. Clark).  Issue One is overruled.

CAUSATION

Expert
Testimony

Within Issue Two,
Loram argues that the trial court erred in allowing Dr. Arthur Ramirez, Officer
Ianni=s sole
expert on causation, to testify over its Robinson challenge.  See E.I. du Pont de Nemours & Co.,
Inc. v. Robinson, 923 S.W.2d 549 (Tex. 1995).  Loram contends that Dr. Ramirez was not
qualified to testify as an expert on methamphetamine abuse and that his
testimony was unreliable.








We review the
trial court=s ruling
that a witness was qualified to testify as an expert under an abuse of
discretion standard.  See Gammill
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718-19 (Tex. 1998); Broders
v. Heise, 924 S.W.2d 148, 151 (Tex. 1996). 
A trial court abuses its discretion if it acts without reference to any
guiding rules or principles.  Robinson,
923 S.W.2d at 558.  Texas Rule of
Evidence 702 provides:  AIf scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.@  Rule 702 contains three requirements for
admission of expert testimony:  (1) the
witness must be qualified; (2) the proposed testimony must be scientific,
technical, or specialized knowledge; and (3) the testimony must Aassist the trier of fact to understand
the evidence or to determine a fact in issue.@  Tex.R.Evid.
702; Robinson, 923 S.W.2d at 556. 
The party offering the expert=s
testimony bears the burden to prove that the witness is qualified under Rule
702.  See Gamill, 972 S.W.2d at
718; Broders, 924 S.W.2d at 151.  Rule
702 also requires that an expert=s
testimony be relevant and based on a reliable foundation.  See Robinson, 923 S.W.2d at 556; Gammill,
972 S.W.2d at 725.

Qualifications

Dr. Ramirez was
called to testify and offer his expert opinion on three issues:  (1) the effect of amphetamines on a person;
(2) the effect of amphetamines on Mr. Tingle; and (3) the effect of amphetamine
use on Mr. Tingle=s
behavior.  Loram contends that Dr. Ramirez
was not qualified to testify as an expert on methamphetamine abuse because only
.04 percent of his practice concerns that specialty and because he had never
been retained as an expert nor published in that field.  At trial, Loram filed a motion to strike Dr.
Ramirez=s
testimony.  The trial court conducted a Daubert
hearing outside the jury=s
presence on the matter.  








Evidence in the
record shows that Dr. Ramirez is a psychiatrist and chairman of the Department
of Neuropsychiatry at Texas Tech University Health Sciences Center in El Paso
where he teaches.  Dr. Ramirez holds a
specialty certification by the American Board of Psychiatry and Neurology and
has diplomat status with the Board.  Dr.
Ramirez is also certified by the American Board of Forensic Psychiatrists.  His professional society memberships include
the American Psychiatric Association, the El Paso County Medical Society, the
Texas Society of Psychiatric Physicians, the Texas Medical Association, the
American Medical Association, and the American College of Forensic
Examiners.  Dr. Ramirez holds hospital
staff appointments at most area hospitals. 
He has held committee appointments in numerous organizations, which
include: Sun Valley Regional Hospital, Life Management Center, William Beaumont
Army Medical Center Inpatient Psychiatry Service, El Paso Mental Health Task
Force Committee, and Committee of the Whole at El Paso Psychiatric Center.  Dr. Ramirez has maintained a private practice
in El Paso since 1985.








Dr. Ramirez
testified that his work on the effect of amphetamines on individuals makes up
less than 1/25th of his practice involving court testimony.  However, he sees amphetamine abuse at least
once a month, either in his medical school or in his private practice.  Dr. Ramirez has had constant contact with
amphetamine abuse and either treats it himself or directs residents in how to
treat the disorder.  Dr. Ramirez admitted
that he had never been retained in this type of case and has never published
anything on amphetamine abuse.  However,
he did not think it was significant that he had not published anything on
amphetamines because an article on the effects of amphetamines on a person
would not be publishable since it has already been described.  Dr. Ramirez teaches psychopharmacology,
the study of medications used to treat psychotic syndromes and medications that
affect the central nervous system.  The
course work includes teaching how other substances like alcohol, amphetamines,
and cocaine can present psychiatric syndromes or disorders.  Based on our review of the record, we
conclude the trial court did not abuse its discretion in determining that Dr.
Ramirez was qualified to testify as an expert on methamphetamine abuse.

Reliability








Loram also
challenges the reliability of Dr. Ramirez=s
opinions.  Pursuant to Rule 702 the trial
court must Aevaluate
the methods, analysis, and principles relied upon in reaching the opinion.  . . . 
[In order to] ensure that the opinion comports with applicable
professional standards outside the courtroom and that it will have a reliable
basis in the knowledge and experience of [the] discipline.@ 
Gammill, 972 S.W.2d at 725‑26 (Tex. 1998)(internal
quotations omitted); see also Tex.R.Evid.
702.  AThe
trial court is not to determine whether an expert=s
conclusions are correct, but only whether the analysis used to reach them is
reliable.@  Gammill, 972 S.W.2d at 728.  In Robinson, the Texas Supreme Court
identified several factors to consider in determining whether scientific
evidence is reliable and thus, admissible under Rule 702.  Robinson, 923 S.W.2d at 557.  The Robinson factors include, but are
not limited to:  (1) the extent to which
the theory has been or can be tested; (2) the extent to which the technique
relies upon the subjective interpretation of the expert; (3) whether the theory
has been subjected to peer review and/or publication; (4) the technique=s potential rate of error; (5) whether
the underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and (6) the non‑judicial uses which have
been made of the theory or technique.  Id.  Loram asserts that Dr. Ramirez=s opinions are unreliable because
he:  (1) failed to conduct any
investigation to rule out alternative causes; (2) reviewed only non-supervisory
co-worker deposition testimony; (3) did not personally examine Mr. Tingle; (4)
relied entirely on his own subjective interpretation in forming his opinions;
(5) made self-serving statements that his technique was accepted in forensic
psychiatry; (6) had a potential rate of error in his technique because there
was no personal evaluation of Mr. Tingle; and (7) formed his opinions solely
for the purpose of litigation.

At the hearing,
Dr. Ramirez testified that based on deposition testimony, it was his opinion
that the effect of the amphetamines in Mr. Tingle--the aggressivity, the
hostility, the shooting of the officer, and marked impulsivity--was fairly
classic for amphetamine abuse. 
Dr. Ramirez was aware that Mr. Tingle=s
supervisors had denied seeing any signs of Mr. Tingle=s
amphetamine abuse.  However, the
supervisors= opinion
did not affect his opinion because he relied on the truthfulness of the
co-workers=
observations of Mr. Tingle and believed that regardless, the fact remained that
Mr. Tingle=s
behavior had changed.  Dr. Ramirez
explained that while he did not personally observe Mr. Tingle=s behavior, whenever examining someone
who is abusing drugs, one has to rely on collateral information from a spouse,
co-workers, or family because the individual generally denies that he is
abusing or using drugs.  Dr. Ramirez stated
that it is common psychiatric practice to review collateral data in evaluating
someone.  Dr. Ramirez uses this type
of forensic analysis, which is based on records and not personal observation of
a patient, outside the courtroom as well. 
While laypersons may not be able to form an opinion as to whether an
individual is using amphetamines, in his day-to-day practice laypersons are
able to make the kind of observations that he can rely in forming his opinion
or making a differential diagnosis.  In
addition, Dr. Ramirez explained that even if he could have observed Mr. Tingle
in jail after the shooting, the amphetamines would have been out of his blood
system and Mr. Tingle would have looked pretty normal at that point.








Although Dr.
Ramirez was questioned by Loram=s
counsel about other possible causes for Mr. Tingle=s
change in behavior, it was his testimony that amphetamine abuse caused
Mr. Tingle=s
behavioral changes.  Dr. Ramirez did not
rely on any specific textbook in forming his opinion and believed the subject
matter was core psychiatric knowledge and that his theory or technique used in
analyzing the data in this case involved core clinical practice in
psychiatry.  To his knowledge, the theory
or technique is fairly standard and is taught by himself, the faculty members
in his department, and at other medical schools and residency programs.  

With respect to
whether the technique he used relied upon his subjective opinion,
Dr. Ramirez explained that it did not, but rather any ordinary
psychiatrist would have arrived at the same opinion.  Dr. Ramirez stated that the theory or technique
of analysis he used has been subject to peer review and is taught in their
general residency program.  In fact, at
least once a week, Dr. Ramirez also conducts peer review in the residency
program on treatment of amphetamine abuse. 
He also believed that his technique in the diagnosis of amphetamine
abuse was fairly standard and not subject to a substantial rate of error.  Dr. Ramirez testified that the  psychiatric community has generally accepted
his underlying theory or technique as valid and that a majority of
psychiatrists would have formed the same opinion in reviewing the same kind of
information he had in this case. 
Further, if a resident came to him with similar information as in this
case, Dr. Ramirez would apply the same standards, theory, and technique that he
used in forming his opinion for testimonial purposes.








Based on our
review of the record, we find there is sufficient evidence supporting the trial
court=s
decision that Dr. Ramirez=s
testimony was reliable under Rule 702 and that the Robinson factors were
satisfactorily met.  Accordingly, we
conclude the trial court did not abuse its discretion with regard to permitting
Dr. Ramirez to testify as an expert witness. 
We overrule this portion of Issue Two.

Proximate
Cause

In Issue Two,
Loram also challenges the legal and factual sufficiency of the evidence to
support the jury=s finding
that it proximately caused Officer Ianni=s
injuries.  Specifically, Loram argues
that Officer Ianni failed to establish that its alleged negligence was the
cause in fact of his injuries and that there was legally and factually
insufficient evidence to establish that the shooting was foreseeable.

Standards
of Review








In reviewing a
legal sufficiency challenge where the complaining party on appeal did not bear
the burden of proof at trial, we analyze the issue as a Ano-evidence@ challenge.  Croucher v. Croucher, 660 S.W.2d 55,
58 (Tex. 1983).  In our review, we
consider the evidence in a light that tends to support the jury=s finding and disregard all evidence
and inferences to the contrary.  Southwest
Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 274 (Tex. 2002).  If there is more than a scintilla of evidence
to support the finding, the legal insufficiency challenge fails.  Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc., 960
S.W.2d 41, 48 (Tex. 1998).  We will
sustain a no-evidence challenge when: 
(1) the record discloses a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of the vital fact.  Marathon Corp. v. Pitzner, 106 S.W.3d
724, 727 (Tex. 2003). The evidence is no more than a scintilla A[w]hen the evidence offered to prove a
vital fact is so weak as to do no more than create a mere surmise or suspicion
of its existence . . . .@  Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983).  More than a
scintilla exists when the evidence Arises
to a level that would enable reasonable and fair-minded people to differ in
their conclusions.@  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994). 

In reviewing Loram=s challenge to the factual sufficiency
of the evidence, we consider all the evidence both supporting and contradicting
the jury=s
finding.  Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).  We will set aside
the judgment only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and manifestly unjust.  Id. 
It is not within the province of the reviewing court to interfere with
the jury=s
resolution of conflicts in the evidence, or to pass on the weight or
credibility of the witnesses=
testimony.  Edmunds v. Sanders, 2
S.W.3d 697, 703 (Tex.App.-‑El Paso 1999, pet. denied).  Where there is conflicting evidence, the
jury's verdict on the matter is generally regarded as conclusive.  Id.

Sufficiency
of Evidence on Proximate Cause








Proximate cause
incorporates two elements:  cause in fact
and foreseeability.  Doe, 907
S.W.2d at 477.  To establish cause in
fact or Abut for@ causation, the complainant must show
that the defendant=s
negligent act or omission was a substantial factor in causing the injury and
without which the harm would not have occurred. 
See Marathon Corp., 106 S.W.3d at 727; Doe, 907 S.W.2d at
477.  The test for foreseeability is
whether a person of ordinary intelligence would have anticipated the danger his
or her negligence creates.  Southwest
Key Program, Inc., 81 S.W.3d at 274, citing El Chico Corp.,
732 S.W.2d at 313.  The foreseeability
element only requires that the general danger be foreseeable, not the precise
sequences of events that produced the harm. 
Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex.
2001).  Proximate cause may be proven by
either direct or circumstantial evidence, but it cannot be based upon
conjecture, guess, or speculation.  Marathon
Corp., 106 S.W.3d at 727; Doe, 907 S.W.2d at 477. 

The deposition
testimony admitted at trial showed that there was widespread drug usage by
Loram crew members.  Roderic Collins
testified that he was aware of other crew members using crystal meth and had
seen Loram supervisor Bernard Soger using the drug in one of the motel rooms.  Mr. Collins saw Mr. Tingle using drugs while
operating one of the rail grinder machines. 
A few days before the shooting, Dwayne Simpson observed Mr. Tingle using
drugs on the job and went to talk to Mr. Pagliarini about it.  Mr. Simpson had warned Mr. Pagliarini that
Mr. Tingle=s
behavior was worsening and that he needed to do something about it.  Mr. Pagliarini told him that he would
look into it.  The next day, Mr. Tingle
confronted Mr. Simpson and was very angry at him because Mr. Pagliarini
had told Mr. Tingle that he had told the supervisor about his problem and Mr.
Tingle was concerned that Mr. Simpson was going to turn him in.  Mr. Simpson also stated that after the
shooting, Mr. Pagliarini told him and other crew members that they were to say
that he [Pagliarini] knew nothing about the drug problem.  Cheryl Sipper testified that Mr. Pagliarini
was involved in the crew=s
drug usage and that she had told him about Mr. Tingle attacking her with a
knife in Deming, New Mexico.  Nick
Kockaniuk also testified that Mr. Pagliarini had used drugs with the crew.








Douglas Grant,
Loram=s human
resources manager, explained that the company=s
drug policy included for-cause and random drug testing of employees and that a
supervisor had the authority to pull a worker off the rail grinder machine and
require a urinalysis.  Mr. Pagliarini
denied knowledge of any crew members using drugs.  He also denied that crew member Dwayne
Simpson told him about Mr. Tingle=s
drug use, but if Mr. Simpson had told him, he would have brought Mr. Tingle in
for a urinalysis, which would have meant taking him off of work on the machine
until the results of the test came back.[6]  Despite the denials, there was contrary
evidence that showed supervisory personnel not only encouraged and facilitated
the crew=s drug
usage, but had also participated in the usage.

In addition, the
testimony showed that Loram workers were required to work long, grueling hours
under harsh working conditions.  Nick
Kockaniuk testified that the company=s
turnover rate was Areal high@ and that it was a dirty job with long
hours in all weather conditions. 
According to Mr. Tingle, the crew was taking crystal methamphetamine to
stay awake and because of the hours that they worked.  The average work week was at least eighty
hours, excluding travel time to and from the machine.  Although days off were scheduled weekly, the
crew did not get them on a regular basis and sometimes they went weeks without
any time off.  In the months preceding
the shooting, Mr. Tingle was not getting his days off.








During May 1994,
Rory Sipper began noticing that Mr. Tingle was Akind
of out of it@ and
groggy at work.  Mr. Sipper thought that
Mr. Tingle was Aglazed,
really out of it,@ and on
one occasion, found Mr. Tingle sleeping in the cab of the machine.  He reported his concerns to
Mr. Pagliarini, who told him not to worry about it and that he would take
care of it.  Mr. Kockaniuk testified
that after Mr. Tingle began using crystal meth, he became jumpy, jittery, edgy,
and fairly excitable.  Mr. Tingle lost
over forty pounds.  By late May, Mr.
Tingle was getting worse, in particular, missing work, calling in sick, and his
work performance declined.  Two or three
days before the shooting, Mr. Simpson observed Mr. Tingle using drugs on the
job and reported the incident to Mr. Pagliarini.  In the days leading up to the shooting, Loram
supervisors were aware Mr. Tingle had attacked the companion of a fellow crew
member in Deming, New Mexico. 
Mr. Pagliarini told the victim he did not want to get
involved.  In his criminal trial
testimony, Mr. Tingle stated that he could not remember when the crew
moved to El Paso and believed he had been awake for four or five days.  The night of the shooting was unclear to him
and he could not recall much about the whole month.

The day before the
shooting, Patrice Tingle had called EAR, Loram=s
employee assistance program to see if she could remove her husband from the
machine and place him in detox.  On the
morning of the shooting, Mrs. Tingle contacted the Attorney General=s domestic violence number and was told
that only her husband=s
supervisor could remove him from the machine. 
The Attorney General=s
office later turned it over to a crisis center, who with Mrs. Sipper,
arranged that Mrs. Sipper would call Mrs. Tingle=s
room that night and if Mrs. Tingle did not answer, Mrs. Sipper was to call
the police.








Mr. Pagliarini
worked with Mr. Tingle on the day of the shooting and did not notice anything
usual about him.  Mr. Kockaniuk, however,
recalled that when Mr. Tingle was coming off his shift on the evening of the
shooting, he had a hollow look in his eyes and his pupils were fully dilated.  Mr. Tingle returned to the motel with the
crew that night.  A little later,
Mrs. Tingle called Mrs. Sipper. 
Mrs. Sipper could hear Mr. Tingle screaming in the background.  He then grabbed the phone away from Mrs.
Tingle and started screaming at Mrs. Sipper before slamming down the
phone.  Mr. Tingle was angry with his wife
because she had hidden all of the drugs and paraphernalia and refused to give
it to him.  Mrs. Sipper left her room and
was going downstairs when she heard Mr. Tingle screaming and saw the Tingles
get into their car to leave.  Moments
later, she heard the gunshots.

Mr. Tingle
testified that he was taking crystal methamphetamine and Valium at the time of
the shooting.  He had been taking
methamphetamine for about ten months and Mr. Pagliarini had knowledge of this
drug usage.  Before the drug usage
occurred, Mr. Tingle and his wife never had any bad arguments, he had never
threatened to kill her, had never physically attacked her, and had never been
accused or arrested for spousal abuse. 
Mr. Tingle believed that if he was not on drugs, he would never have
hurt Officer Ianni.  Mr. Tingle also
stated that if Mr. Pagliarini had reported to the company that he needed to be
drug tested in the weeks prior to the shooting, he definitely would have tested
positive and been put in a drug rehabilitation program.

According to Dr.
Ramirez, based on his clinical experience, the symptoms of amphetamine abuse
include hostility, impulsivity, elevated heart rate, sweating, pupillary
changes, mood changes, insomnia, confusion, and usually anger or irritability.  Based on deposition testimony by Mr. Tingle=s co-workers and his wife, Mr. Tingle=s drug screening, which revealed
amphetamine use, and Mr. Tingle=s
admission, it was Dr. Ramirez=s
opinion that the shooting would not have occurred if Mr. Tingle was not using
or abusing amphetamines. 
Dr. Ramirez believed that if Mr. Tingle had been treated for his
amphetamine abuse, the shooting would not have occurred.  In forming his opinions, Dr. Ramirez
considered other general circumstances, like gun possession and marital
discord, that may have caused the events in this case along with the specific
information that was provided to him.  On
cross-examination, Dr. Ramirez conceded that he did not know when or how
Mr. Tingle took the drugs on the day of the incident nor the frequency of his
drug usage.








In deposition
testimony, Loram supervisor Bernard Soger explained the company=s drug prohibition policy.  Supervisors were instructed to look for
specific symptoms of drug usage, such as missing work frequently, poor job
performance, a decline in job performance, being late for the transport truck, or
sleeping on the machine.  If a crew
member tests positive for drug usage following a urinalysis, that employee
would be required to attend a treatment program as a first offense and would be
tested more often thereafter.  The
treatment program must be completed before the employee could return to work.[7]








The evidence at
trial is legally and factually sufficient to support the jury=s finding that Loram proximately caused
the injuries Officer Ianni sustained in his attempt to assist Mrs. Tingle as a
result of the dangerous situation that Loram supervisors had created.  Loram supervisors knew of the crew=s drug usage, and according to a number
of witnesses, they actually facilitated and encouraged this drug usage.  Despite warnings from co-workers and
non-employees, Loram supervisor Doug Pagliarini ignored the escalation in Mr.
Tingle=s drug
abuse and altered behavior and failed to follow standard drug testing and
treatment procedures.  Loram also failed
to take the appropriate actions after Mr. Tingle attacked Cheryl Sipper for
attempting to assist his wife.  Under
these circumstances, we cannot say that Loram could not have anticipated the
general danger it created by their negligent conduct.  Moreover, the evidence reveals that Loram=s negligence was the cause-in-fact of
Officer Ianni=s
injuries in that its negligent conduct was a substantial factor in causing the
injury and without which the harm would not have occurred.  We recognized that cause-in-fact is not shown
if a defendant=s
negligence merely provided a condition that made the injury possible.  Doe, 907 S.W.2d at 477.  However, in this case, Loram did much more
than merely provide a condition, but rather was instrumental in bringing about
the harm suffered.  We conclude there is
legally sufficient evidence to support the jury=s
finding as well as factually sufficient evidence because the finding is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
manifestly unjust.  Issue Two is overruled.

GROSS
NEGLIGENCE AND PUNITIVE DAMAGES

Gross
Negligence

In Issue Three,
Loram contends the evidence is legally and factually insufficient to establish
that Loram was grossly negligent or liable for punitive damages.  Specifically, Loram asserts that the
employees whom the jury found to be grossly negligent, were not vice principals
of the company nor were they acting in a managerial capacity.  Further, Loram argues that the evidence is
legally and factually insufficient to establish gross negligence under Moriel.  In our review of this issue, we apply the
appropriate standards of review for sufficiency challenges that we set out
above in our discussion of Issue Two.








Under the
two-prong test for establishing gross negligence in Moriel:  (1) the defendant=s
act or omission must involve an extreme degree of risk, considering the
probability and magnitude of the potential harm to others; and (2) the
defendant must have actual subjective awareness of the risk involved but
nevertheless proceed in conscious indifference to the rights, safety, or
welfare of others.  Moriel, 879
S.W.2d at 23.  Only if the act or
omission is unjustifiable and likely to cause serious harm can it be grossly
negligent.  Moriel, 879 S.W.2d at
22.  Where this sort of exemplary damages
are sought against a corporate entity, there must be a showing that someone
employed in a managerial capacity and acting in the scope of that managerial
capacity was grossly negligent.  Dalworth
Trucking Co. v. Bulen, 924 S.W.2d 728, 733 (Tex.App.--Texarkana 1996, no
writ), citing King v. McGuff, 149 Tex. 432, 234 S.W.2d 403, 405
(1950).  

First, Loram
argues that the employees whom the jury found to be grossly negligent,
Mr. Pagliarini and Mr. Soger, were neither vice principals nor acting in a
managerial capacity.[8]  Loram asserts that these employees were
machine superintendents who were not corporate officers, had no authority to
employ or discharge Loram employees, did not engage in nondelegable duties, and
were not confided the management of the whole or a department or division of
Loram=s
business.








Ralph Weber, Loram=s manager of safety and environment,
testified that Loram has 450 employees, half of which are employed out in the
field, operating and maintaining rail grinding machinery on railroad
tracks.  The average size of a crew is
twelve to fourteen people. 
Mr. Weber explained that the supervisor is the head of one of the
rail grinder crews, with the crew chief, field clerk, and night crew lead
reporting to him.  According to Mr.
Weber, the supervisor is the only person that has any real authority on the
machine.

In his deposition
testimony, Douglas Pagliarini described his function as a supervisor, in
particular as relief superintendent, on Rail Grinder number 8 for Loram.  His daily duties involved overseeing all the
day-to-day operations on the machine, supervision of the crew, maintenance of
the machine, and interaction with the customer, the railroad.  As supervisor, Mr. Pagliarini stayed
with the machine and crew during the shift. 
Mr. Pagliarini was aware that it was his responsibility to enforce the
company=s drug
policy with regard to the crew.  If he
had any reasonable suspicion that a crew member was using drugs, he had the
authority to request urinalysis.  If
somebody on the crew had indicated to him that there was drug use among the
crew, Mr. Pagliarini would have told Patrick Eischens, the division manager,
with whom he was in daily communication. 
Mr. Eischens made periodic visits to inspect operations once every month
or two.

Mr. Pagliarini stated,
however, that he did not have authority to change Loram policies or rules in
machine operation.  He also was not able
to hire workers for the crew of RG 8, which was done through Loram=s main office in Minnesota.  While he could decide unilaterally to fire
someone if it was a severe safety matter, he generally would inform his
division manager and give his reasons for the dismissal.[9]








Through his
deposition testimony, Bernard Soger testified that he worked for Loram from
March 1986 to March 1995, being promoted during that time frame from rail
grinder operator to leadman to field clerk, and finally to superintendent.[10]  Mr. Soger was aware that as supervisor, it
was his responsibility to implement the company=s
drug policy.  If another worker had
approached him because that worker felt somebody was using drugs, Mr. Soger did
not believe that this would give rise to a reasonable suspicion to justify
asking for a urinalysis if that individual=s
job performance was fine.  Mr. Soger
stated, AI am not
going to just give somebody a urinalysis so they can have five days off with
pay if I need them on the machine to work, and I don=t
have reason to believe that they are on any kind of drugs.@ 
While a superintendent is encouraged to investigate the circumstances of
alleged drug use, Mr. Grant testified that it was never appropriate for a
supervisor to ignore a crew member=s
report of drug use nor was it appropriate for a supervisor to suspect drug use
and not report it because he did not want to have downtime on the machine.








The evidence is
legally and factually sufficient to establish that Mr. Soger and
Mr. Pagliarini were on-site supervisors employed by Loram in a managerial
capacity.  As supervisors, they were the
highest ranked Loram employees on the machine. 
They were responsible for properly implementing and enforcing the
company=s drug
policy, yet they failed to do so.  While
machine workers were hired and trained at the main office in Minnesota, once
out in the field, they could be fired unilaterally by a supervisor in instances
involving severe safety concerns. 

Second, Loram argues
that there is no evidence that its conduct created an extreme degree of risk
because it did not create the likelihood of serious injury to Officer
Ianni.  See Moriel, 879
S.W.2d at 22.  Specifically, Loram
asserts there is no evidence to suggest Mr. Tingle was likely to shoot anyone,
much less a police officer.

The evidence shows
that because of the safety sensitive positions in the organization, Loram had
formulated a drug policy that prohibited the use of controlled substances by
employees and had adopted a drug testing program to determine the use and/or
abuse of drugs by employees that in any way adversely affected their alertness,
coordination, reaction, response, or safety. 
Mr. Soger and Mr. Pagliarini, as on-site supervisors, were responsible for
properly implementing the policy, which required for-cause drug testing upon
reasonable suspicion.  Testimony from Rod
Collins, Cheryl Sipper, Nikolas Kockaniuk, Dwayne Simpson, and Roger Tingle
provides some evidence that the supervisors were involved in the crew=s rampant drug usage and that Mr.
Pagliarini, in particular, was repeatedly warned about Mr. Tingle=s worsening condition and his attack on
Mrs. Sipper in New Mexico.  Despite this
knowledge, Mr. Pagliarini did not notify upper management, did not remove Mr.
Tingle from the machine, and did not request drug testing.  While the supervisors did not know the
identity of the individual put in harm=s
way, they objectively knew that their misconduct involved an extreme degree of
risk that was likely to cause serious harm to others during the course of the
crew=s travel
with the machine.  See Moriel, 879
S.W.2d at 22.








Third, Loram
argues that there is no evidence establishing conscious indifference.  However, there is some evidence to show that
Mr. Pagliarini had actual subjective awareness of the risk involved, but
nevertheless proceeding in conscious indifference to the safety and welfare of
others.  According to witnesses Cheryl
Sipper, Nikolas Kockaniuk, and Roger Tingle, Mr. Pagliarini was involved
in the crew=s drug
usage and according to Mr. Tingle, Mr. Pagliarini knew that his trip to Barstow
was for the purpose of acquiring more drugs for the crew.  Mr. Tingle testified that Mr. Pagliarini
had been present when he was using drugs and even gave him some when he was
out.  Mr. Tingle also stated that Mr.
Pagliarini had observed him in an incapacitated state while at work, knew that
his condition was a result of drug usage, and gave him a warning.

During May 1994,
Rory Sipper observed Mr. Tingle sleeping in the cab of the machine and reported
his concerns to Mr. Pagliarini.  Mr. Pagliarini
told him not to worry about it and that he would take care of it.  A few days before the shooting, Dwayne
Simpson notified Mr. Pagliarini that Mr. Tingle was using drugs on the
job.  Mr. Simpson warned Mr. Pagliarini
that Mr. Tingle=s
behavior was worsening and that he needed to do something about it.  Mr. Pagliarini said he would look into
it and apparently talked to Mr. Tingle who later confronted Mr. Simpson.  However, Mr. Pagliarini took no further
action.  In the days before the shooting,
Mrs. Sipper told Mr. Pagliarini about Mr. Tingle attacking her in New Mexico,
but still Mr. Pagliarini failed to take the appropriate action.  After the shooting, Mr. Pagliarini told
Mr. Simpson and other crew members to say that he knew nothing about the
drug problem.








 We conclude the evidence is legally sufficient
as there is some evidence to support the jury=s
finding of gross negligence.  Further,
the evidence in support of this finding is factually sufficient as it is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
manifestly unjust.[11]  Issue Three is overruled.

For the reasons
stated above, we affirm the trial court=s
judgment.

 

 

June
30, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.











[1]
Both parties agree that this Court thoroughly summarized the deposition
testimony submitted in the summary judgment proceeding in our opinion in Ianni
v. Loram Maintenance of Way, Inc., 16 S.W.3d 508 (Tex.App.--El Paso 2000,
pet. denied)(AIanni
I@), the
same evidence which was later admitted at trial.  Therefore, we will provide only a brief
recitation of the relevant facts and will give particular attention to other
evidence admitted at trial where appropriate in our discussion of the issues
raised in this appeal.





[2]
Douglas Pagliarini substituted for Mr. Soger during Soger=s vacation.  Mr. Pagliarini had been with the crew and
machine for about two weeks when the shooting occurred.





[3]
Contrary to his wife=s
testimony, Rory Sipper denied ever noticing any drug usage among the crew
members.





[4]
Mr. Nicholson, however, stated in deposition testimony that he never saw Mr.
Tingle acting anything other than normal, never saw Mr. Tingle using drugs, and
to his knowledge, no one on the crew was using drugs.  Mr. Nicholson also stated that he did not
know anything about Mr. Tingle attacking Mrs. Sipper with a knife.





[5]
According to Mrs. Sipper, Mr. Nicholson was with her when she spoke to Mr.
Pagliarini about the attack and confirmed her description of events.





[6]
Mr. Pagliarini explained that ordinarily the urinalysis procedure involves
setting up a hospital visit in which the test is given using Loram=s own kit and laboratory.  The test would ordinarily be conducted at the
location where the crew was currently located.





[7]
It was Mr. Pagliarini=s
understanding that under the drug policy, if one tested positive for drugs, or
if you were suspected of using drugs, that person was taken off the
machine.  Human Resources Manager Douglas
Grant also testified that if a supervisor receives reports that a person is on
drugs and notices usual behavior, that individual would be taken out of service
and escorted to a clinic or hospital for testing.  If that employee refused to be tested, he
would be advised that he would be terminated. 
If the test is positive, the individual is assessed and treated before
returning to work.  Mr. Grant explained
that while the test results were pending, the individual would Astay out of service.@ 
That individual would travel with the crew from one location to another
pending the results.





[8]
In Question Number Three, the jury was instructed that for Loram to be grossly
negligent, it must find that either Mr. Pagliarini, Mr. Soger, and/or Mr.
Kochaniuk were grossly negligent and were employed by Loram in a managerial
capacity and were acting in the scope of that managerial capacity.  The charge included the following
definition:  AA
person is employed in a managerial capacity of a corporation if (a) he is a
corporate officer; (b) he has authority to employ, direct, and discharge
employees of the corporation; (c) he is engaged in the performance of
nondelegable or absolute duties of the corporation; or (d) the corporation has
confided in him the management of (1) the whole of the business or (2) a
department or division of the business.@





[9]
Interestingly, Douglas Grant, Loram=s
human resources manager, testified that if he was contacted by a supervisor and
was informed that the supervisor had caught an employee using drugs on the job,
he would recommend that the supervisor fire that individual.





[10]
Mr. Soger explained that an operator maintains and operates the rail grinder
machine.  The field clerk travels with
the crew and handles all of the paperwork, obtains all the spare parts, and
coordinates the moving of the crew.  Mr.
Soger understood his position as superintendent to include the following
duties:  supervisory authority over the
crew and directing and maintaining the rail grinder itself.  As superintendent, Mr. Soger was the
highest-ranked company official on site and reported directly to Mr.
Eischens.  Mr. Soger had been a superintendent
for about six years before coming to the RG8 crew in January 1994.  Prior to that, Mr. Pagliarini had been the
crew=s
superintendent.





[11]
Within Issue Three, Loram also asserts that the amount of punitive damages
awarded by the jury is legally and factually insufficient, but fails to provide
any argument in support of their contention nor does it cite to any
authorities.  Therefore, we find that it
has waived this complaint on appeal.  See
Tex.R.App.P. 38.1(h).