

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00562-CR

---

TROY ALLEN BISHOP                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1303843D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

In three issues, appellant Troy Allen Bishop appeals his conviction for possession of methamphetamine in the amount of more than four grams but less than 200 grams.[2] Bishop argues that the trial court erred by overruling his motion

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Health & Safety Code Ann. § 481.115(d) (West 2010).

to suppress evidence that police officers found after searching his truck—specifically that he did not voluntarily consent to the search and that his consent was obtained in violation of *Miranda*. Bishop further argues that the evidence is legally insufficient to support the jury's verdict that he possessed methamphetamine. We will affirm.

## II. BACKGROUND

After the State charged Bishop with one count of possession and one count of delivery of a controlled substance, the trial court held a hearing on Bishop's motion to suppress. At the hearing, City of Euless Police Officer Brian Mabry testified that on November 8, 2012, he and an officer he was training were patrolling around noon when Mabry observed a pickup truck parked at a Texaco gas station. There were two occupants in the truck. Mabry said that the truck caught his eye because "[i]t just seemed to be stopped in the parking lot." Believing that "there could be a problem," Mabry instructed the trainee to "turn around and go back to check out the truck." According to Mabry, the truck was parked in an area where robberies and burglaries had been committed at nearby businesses.

As the trainee pulled the patrol vehicle behind the truck, but without blocking it in, Mabry said that he noticed the driver was no longer in the truck. Mabry instructed the trainee to "get out and see if everything [was] okay." At this time, Mabry noticed that the license plates on the truck were out-of-state plates.

2

Mabry said that this fact furthered his suspicion that maybe the individuals were lost or having mechanical problems with the truck.

Mabry said that he got out of the patrol vehicle in order to "observe the recruit and the way he was conducting" the encounter. From Mabry's vantage point, he could hear the passenger stating to the trainee that the occupants of the truck had run out of gas and were waiting on a friend to bring them $10. Mabry said that he also heard the passenger tell the trainee that the driver of the truck had gone inside the convenience store to play "eight liners." Mabry averred that this response struck him as odd given that the passenger had stated that he and the driver were waiting for someone to bring them $10 for gas. Mabry asked the passenger, "If you're out of gas and gas money, why would he be inside playing . . . eight liner games?"

According to Mabry, at this time, he saw a man, later identified as Bishop, exit the Texaco. Mabry said that Bishop caught his attention because he was one of the few customers coming out of the store and he initially appeared to be walking toward the truck. When Bishop made eye contact with the officers, he "immediately turned left and walked away." Mabry asked the passenger whether the man was the driver, to which the passenger said, "Oh, yeah."

Mabry described that when Bishop saw the officers, he looked "surprised" and that as he walked away, he appeared "as if he wasn't sure where he was going to go." After walking away from the officers, Bishop proceeded across the street and into a nearby Domino's. Mabry said that as Bishop walked across the

3

street, he did not use the designated crosswalk and he "didn't appear to be paying attention to the cars or anything like that." Mabry said that Bishop's actions caused the lunchtime traffic to slow down.

Mabry said that he then radioed another officer and asked that he make contact with Bishop. As he awaited the other officer, Mabry said that he could see Bishop go in and out of the Domino's while using a cellphone. Mabry said that Euless Police Corporal Ray Hinojosa responded to his call.

Mabry said that after Hinojosa arrived, they conversed via radio. After confirming that Hinojosa had made contact with Bishop, and after the passenger stated that consent to search the truck was not the passenger's consent to give, Mabry asked Hinojosa to inquire of Bishop whether he would give consent to search the truck. Mabry testified that Hinojosa said that Bishop had given consent and that Hinojosa then brought Bishop to the vehicle because, according to Mabry, "the person needs to be there if they change their mind when they want to withdraw their consent. And since he was across the street, I asked him if he would bring him over to us." Mabry said that Bishop never withdrew his consent and that he seemed "okay" with the officers' searching the truck. Mabry also said that besides Hinojosa, himself, and the trainee, no other officers arrived until after the search of the truck had begun.

Hinojosa testified that he came into contact with Bishop inside the Domino's shortly after Mabry had radioed for assistance. According to Hinojosa, Bishop was on the phone. Hinojosa said that he approached Bishop and asked,

4

"Do you mind . . . coming outside, speaking to me?" Hinojosa averred that Bishop said, "Sure" and walked outside. From there, Hinojosa said that he asked Bishop if the truck Mabry was attending was his, to which Bishop allegedly said, "[Y]es." Hinojosa said that he then asked Bishop if he would consent to Mabry's searching the truck. Hinojosa said that Bishop said, "Sure, go ahead." By Hinojosa's account, Bishop was not being detained at that moment and the encounter was consensual. Hinojosa averred that when he asked Bishop to step outside and asked him for consent to search the truck, Hinojosa was unaccompanied by another officer. Hinojosa said that he and Bishop then got into his patrol vehicle and drove across the street to where Mabry and the truck were. Hinojosa averred that Bishop "voluntarily" rode with him after Hinojosa extended an invitation to drive back across the street. Once across the street, both Hinojosa and Bishop exited the vehicle, and Mabry began to talk with Bishop.

Bishop did not testify at the suppression hearing, and at the close of arguments, the trial court denied Bishop's motion to suppress. In its conclusions of law, the trial court concluded that Bishop had freely and voluntarily given consent to search his truck when he stated, "Sure, go ahead." The court also concluded that Bishop's consent was not the result of coercion or threat by the officers. Later, trial commenced.

At trial, Mabry testified that when he and the trainee were talking with Bishop's passenger, the officers did not notice anything suspicious about what

was in the back of the truck other than that it was "packed with things." Mabry averred that the truck appeared to be in a condition consistent with the passenger's story that he and Bishop had traveled from Michigan. Much like at the suppression hearing, Mabry described that what piqued his interest was the passenger's seemingly inconsistent stories that they were out of gas and that Bishop was inside playing eight-liner video games.

Mabry again described how he saw Bishop exit the convenience store, notice that police were talking with the passenger, and then abruptly walk off "as if he [wasn't] sure where [he was] going to go." Mabry also testified how Bishop had walked across a busy street without using the crosswalk. Mabry described Bishop's actions as apprehensive.

Mabry said that after Hinojosa obtained consent to search the truck, the trainee alerted Mabry to what appeared to be a live "one-pot cook" for methamphetamine, which Mabry described as a procedure for manufacturing methamphetamine. Mabry also said that such a setup is dangerous. Given the potential volatility of what the officers found, Mabry "called for experts."

Hinojosa testified at trial that he had made a "consensual contact" with Bishop after Mabry had radioed him to do so. Hinojosa recalled that he had asked Bishop to come outside the Domino's and that Bishop "followed [him] outside." Hinojosa said that he asked Bishop if the truck at the convenience store was his, to which Bishop said it was. At this time, the State introduced evidence that Bishop was the registered owner of the truck. Hinojosa also said

6

that he then asked Bishop if Mabry could search his truck, and Bishop said, "Yes." Later, under cross-examination, Hinojosa said that Bishop had stated, "Go ahead. There's nothing in there."

Hinojosa also averred that Bishop agreed to ride in Hinojosa's patrol vehicle in order for them to get back to Bishop's truck. Hinojosa said that the only time he looked in Bishop's truck was after Mabry had detained Bishop and, according to Hinojosa, he saw what he "thought [] might be associated with [Bishop] making some meth." Hinojosa also testified that after Mabry had discovered the "cook" in the truck, Mabry had radioed for City of Euless Police Detective Josh Bennett's assistance.

Bennett said that when he arrived, Mabry pointed him to what Bennett also believed was "a methamphetamine lab." According to Bennett, there was a "strong burning odor" that emanated from the lab, so much so that it made his nose and throat sore, and made his lips feel chapped. Bennett said that after he identified the lab, he contacted a "certified lab technician" to come out and dismantle the lab. Bennett also said that the lab required a HAZMAT unit to assist in its dismantling. Similar to the testimony of Mabry and Hinojosa, Bennett averred that the lab was in "a cardboard box in the bed of the pickup truck." After the specialists dismantled the lab, Bennett testified that he then took the substances found in the lab for testing. Bennett said that among the materials found in the truck, the search revealed fuel, sodium hydroxide, ammonium nitrate, and a chemical composed mainly of sulfuric acid—all substances utilized

7

in manufacturing methamphetamine. Bennett also described in detail the apparatus found in the cardboard box.

According to Bennett, the "one-pot cook" method of manufacturing methamphetamine requires that someone regularly "burp" the bottle. By Bennett's account, if the "cook" does not regularly burp the bottle, the bottle "will explode." Bennett also said that among the items retrieved from the back of the truck was a pipe used to smoke methamphetamine.

Timothy Wing, a Police Officer for the City of Mansfield who is trained in the investigation and disposal of methamphetamine labs, testified at trial as well. Wing described to the jury how methamphetamine production had recently turned from being a "four- or five-step" process into being an "all in one container" method that produces methamphetamine "quicker" than in years past. Wing said that he responded to Bennett's call to dismantle "a reaction vessel that was under pressure." Wing said that when he arrived, he deduced that what was found in the back of Bishop's truck was a "one-pot" methamphetamine lab. Wing said that the lab required a "burp" when he arrived. According to Wing, the "one-pot" method's entire process is completed in between thirty minutes and one hour.

Sarah Skiles, senior forensic chemist for the Tarrant County Medical Examiner's Office, testified that she tested the items found during the search of Bishop's truck. Among the items tested, Skiles averred that she tested "damp paper towels" found inside the cardboard box. After Skiles "wrung out the liquid"

8

from the paper towels into "a beaker," she determined it to be roughly twenty-seven grams of liquid containing a "detectable amount of methamphetamine." She also tested the contents of "a plastic bottle containing a slightly cloudy liquid," which she also determined to be an additional twenty-seven grams of liquid containing methamphetamine.

Bishop testified in his defense. Bishop said that he lives in Michigan and that he came to Texas in November 2012 in order to help his cousin "Ray" move to Texas and in order for Bishop to earn some extra money for the Christmas season. By Bishop's account, even though Ray had told him there was work available in Dallas, there was no such work when the two arrived. Bishop said that shortly after learning there was no work to earn money, Ray had "some girl he knows" join them, and the three agreed to spend the night in a motel in Euless. Bishop said that he went to bed and that Ray and the girl went "gambling." According to Bishop, Ray and the girl returned at 3 a.m. and the girl asked Bishop to give her a ride home. Bishop said he declined and went back to sleep.

Bishop said that he awoke later that morning to a "trashed" motel room. He averred that when he next saw Ray, Ray informed him that he and the girl had been with a friend of theirs who was "going back to jail" because of "[c]oke and meth." Bishop told Ray that they needed to leave immediately because checkout time was upon them. Bishop said that he threw his "black duffle bag"

9

into the driver's side area of the truck bed and all that he saw in the back of the truck was "our hunting stuff that [Ray had not] taken care of."

Bishop said that after starting the truck, and unbeknownst to him, the truck was nearly out of gas, so they had to "coast" into the Texaco's parking lot. Upon stopping, Bishop said that he learned that Ray did not have any money. Bishop testified that Ray then called a friend who agreed to bring them some gas money. While they waited, Bishop averred that he went into the convenience store to buy a bottle of water.

Bishop said that as he stood in line to pay for the water, he saw a patrol unit pull in near his truck. Bishop said that he "booked across the street to Domino's" because he feared discovery that his license was suspended. While there, he said that he saw police had "pulled Ray out of the truck." He also said that while he was in Domino's, "a Spanish officer and a woman walked into the Domino's and they said, 'Oh, can you come out and talk to us?'" Bishop said that he responded, "Yeah." Bishop also averred that when he was asked whether Mabry could search his truck, he responded, "Yeah, I don't care. I ain't got nothing to hide in there." Bishop testified that he declined Hinojosa's offer to drive him across the street; instead, Bishop said that he walked back over.

According to Bishop, there were "at least six" police officers involved in searching his truck. Bishop said the "next thing [he knew, he was] being handcuffed and put in[to] a cop car." Bishop said that when asked, he told an officer that he did not know who the "cook" was and that he was unaware of a lab

10

being in the bed of his truck.  Bishop said that the officer told him he did not care what Bishop's "story" was and that the officer specifically said to him, "I don't believe you.  I'm charging you."

By Bishop's account, the methamphetamine lab was not in a cardboard box in his truck but was in Ray's luggage.  Bishop said that when the officers found it, Ray said to him, "Sorry, Cuz."  Bishop testified that Ray later emailed him an apology as well.

A jury found Bishop guilty of possession of methamphetamine in the amount of more than four grams but less than 200 grams.  The jury then assessed punishment at ten years' confinement.  The trial court suspended imposition of Bishop's sentence and placed him on community supervision for ten years.  This appeal followed.

### III. DISCUSSION

### A.    A Consensual Search

In his first issue, Bishop argues that the trial court abused its discretion by finding that he voluntarily consented to the search of his truck.  Bishop specifically argues that he "was in custody" at the time he consented to the search of his truck and that rather than consenting, he was "submitting to the police show of authority."

### 1.    Standard of Review

Generally, we review a trial court's ruling on a motion to suppress under a bifurcated standard of review.  *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex.

11

Crim. App. 2010); *see also Elizondo v. State*, 382 S.W.3d 389, 393 (Tex. Crim. App. 2012). When the trial court's findings of fact are based on an evaluation of credibility and demeanor, we afford almost total deference to the trial court's determination of facts that are supported by the record. *Valtierra*, 310 S.W.3d at 447. *Id.* (citing *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000)). We review de novo the trial court's application of the law to the facts. We will uphold the trial court's ruling if it is supported by the record and is correct under any theory of law applicable to the case. *Elizondo*, 382 S.W.3d at 393–94.

Appellate review of a trial court's ruling on a motion to suppress is ordinarily limited to the record at the time of the suppression hearing. *Turrubiate v. State*, 399 S.W.3d 147, 150–51 (Tex. Crim. App. 2013). But if the parties consensually re-litigate the suppression issue again before the factfinder at trial, the reviewing court should also consider the evidence adduced at trial in gauging the propriety of the trial court's ruling on the motion to suppress. *Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012).

### 2. Consensual Encounters and Voluntary Consent

Law enforcement and citizens engage in three distinct types of interactions: (1) consensual encounters; (2) investigatory detentions; and (3) arrests. *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011). Consensual police-citizen encounters do not implicate Fourth Amendment protections. *Id.* Law enforcement officers are free to stop and question a fellow citizen—no justification is required for an officer to request information from a

citizen. *Id.* And citizens may, at will, terminate consensual encounters. *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). Even when the officer does not communicate to the citizen that the request for information may be ignored, the citizen's acquiescence to an official's request does not cause the encounter to lose its consensual nature. *Woodard*, 341 S.W.3d at 411. Courts consider the totality of the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would have felt free to ignore the request or terminate the interaction. *Id.* The surrounding circumstances, including time and place, are taken into account, but the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure. *Id.*

"Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity." *Fernandez v. California*, --- U.S. ---, 134 S. Ct. 1126, 1132 (2014) (citations and internal quotations omitted).

The State must prove the voluntariness of a person's consent by clear and convincing evidence. *Valtierra*, 310 S.W.3d at 448. A trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011); *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007). Further, when voluntary consent is an issue, "the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may

13

be drawn from that evidence." *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). Voluntariness is determined by analyzing the totality of the circumstances of the situation from the view of an objectively reasonable person. *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012).

### 3. Trial Court's Ruling Supported by Record

Here, although neither party addresses the issue, Bishop cites to portions of his testimony which occurred at trial only—he did not testify at the suppression hearing. We will assume without deciding that the parties in this case mutually re-litigated the suppression issues. *See Black*, 362 S.W.3d at 635 (discussing mutual re-litigation and the evidence a reviewing court should consider when analyzing suppression issues). But even considering all of the record evidence, we conclude that the trial court did not clearly err by concluding that Bishop voluntarily consented to the search of his truck. *See Meekins*, 340 S.W.3d at 460 (applying clearly erroneous standard to review of trial court's ruling of voluntary consent).

Bishop argues that he was in custody at the time Hinojosa requested consent to search his truck, but considering the totality of the circumstances surrounding the interaction between Hinojosa and Bishop, the record supports the trial court's implicit conclusion that Bishop was not in custody when Hinojosa asked for Bishop's consent. It should first be noted that in his brief, Bishop makes assertions as to why he acquiesced to Hinojosa that are unsupported by the record. Bishop states in his brief that "an officer chase[d] him entirely across

14

the street." There is no record evidence of this assertion. Further, while admitting that Hinojosa "ask[ed] him to step outside" once their interaction began in the Domino's, Bishop relies on his assertion that Hinojosa was not alone when this occurred as evidence that he was acquiescing to an official display of authority. But the only testimony that Hinojosa was not alone came from Bishop. Both Hinojosa and Mabry testified that Hinojosa was alone when he encountered Bishop in Domino's, and Hinojosa testified that their interaction was consensual.

The trial court was free to disbelieve Bishop's testimony and rely upon Hinojosa's and Mabry's testimonies in concluding that the interaction between the officers and Bishop was consensual. *Valtierra*, 310 S.W.3d at 447. Moreover, Bishop argues on appeal that Hinojosa "removed him from" Domino's and "put him in the back of their police car." But Bishop testified that his response to Hinojosa's request to step outside was, "Yeah." This testimony is consistent with Hinojosa's testimony that Bishop agreed to come outside. Bishop also testified that he walked back across the street. Even though Hinojosa's testimony—that he offered Bishop a ride back across the street and that Bishop accepted this invitation—conflicted with Bishop's, the trial court was again free to believe Hinojosa's testimony that the ride was consensual or to believe that Bishop freely walked back across the street. *See id.* We conclude that the record supports the trial court's implicit conclusion that Bishop was not in custody at the time Hinojosa requested consent for Mabry to search his truck. Thus, we

are left to analyze whether the record supports the trial court's conclusion that Bishop voluntarily consented to the search.

Affording the strongest legitimate view of the record evidence, and all reasonable inferences that may be drawn from that evidence, we conclude that the trial court's voluntariness conclusion is supported by the record. *See Garcia–Cantu*, 253 S.W.3d at 241. Even viewing Bishop's own testimony, the trial court's decision is supportable. Indeed, Bishop testified that he consented to the search of his truck because he had "nothing to hide." Bishop said that he asserted "[y]eah" to Hinojosa's request for consent to search the truck. Furthermore, Hinojosa testified that Bishop freely stepped outside of the Domino's upon being asked and that Bishop consented to the search of his truck. We hold that the trial court's conclusion that Bishop voluntarily consented to the search of his truck was not clearly erroneous, and thus we overrule Bishop's first issue. *See Meekins*, 340 S.W.3d at 460.

## B. Bishop's Consent was not a Custodial Statement

In his second issue, Bishop argues that his consent to search his truck was made in violation of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Bishop's argument is predicated on his assertion that he was being unlawfully detained when Hinojosa requested consent to search the truck. Because we concluded in Bishop's first issue that the trial court's legal conclusion that what occurred between Hinojosa and Bishop was a consensual interaction, we overrule Bishop's second issue. *See Herrera v. State*, 241

16

S.W.3d 520, 527 (Tex. Crim. App. 2007) ("The purpose of the questioning, standing alone, in this instance, does not show 'custody' within the meaning of *Miranda*.").

## C.    Possession

In his third issue, Bishop argues that the evidence is insufficient to support his conviction because, according to Bishop, the State failed to prove sufficient links between himself and the methamphetamine found in the back of his truck. We disagree.

### 1.    Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing

the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## 2. Proof of Possession

To prove possession, the State must prove that the accused intentionally or knowingly (1) exercised actual care, custody, control, or management over the substance and (2) knew that the matter possessed was a controlled substance. *See* Tex. Health & Safety Code Ann. § 481.002(38) (West 2010 & Supp. 2014); *see also Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). The State may prove the elements of possession through direct or circumstantial evidence; however, the evidence must establish that the accused's connection with the substance was more than fortuitous. *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005).

If the contraband is not found on the accused's person, independent facts and circumstances may "link" the accused to the contraband such that it may be justifiably concluded that the accused knowingly possessed the contraband. *Evans*, 202 S.W.3d at 161–62; *Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Links are established by the totality of the circumstances, and no set formula necessitates a finding of a link sufficient to support an inference of knowing possession. *Wright v. State*, 401 S.W.3d 813, 819 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The number of linking factors present is not as important as the "logical force" they create to prove that an offense was committed. *Roberson*, 80 S.W.3d at 735. The absence of

18

various links does not constitute evidence of innocence to be weighed against the links present. *Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976); *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

Texas courts have identified a non-exhaustive list of links that may, alone or in combination with others, establish a person's knowing possession of contraband, including: whether the contraband was (1) in plain view; (2) conveniently accessible to or found on the same side of the car as the accused; (3) in a place owned, rented, possessed, or controlled by the accused; (4) in a car driven by the accused; or (5) found in an enclosed space; whether (6) the odor of narcotics was present; (7) drug paraphernalia was present, in view of, or found on the accused; (8) the accused's conduct indicated a consciousness of guilt (e.g., furtive gestures, flight, conflicting statements); (9) the accused had a special relationship to the drug; (10) the accused possessed other contraband or narcotics when arrested; (11) the accused was under the influence of narcotics when arrested; (12) affirmative statements connected the accused to the drug; (13) the accused was present when the search was conducted and whether others were present at the time of the search; (14) the accused was found with a large amount of cash; (15) the amount of contraband found was large enough to indicate that the accused knew of its existence; and (16) the accused had a relationship to other persons with access to where the drugs were found. *Evans*, 202 S.W.3d at 162 n.12; *Roberson*, 80

19

S.W.3d at 735 n.2; *Villegas v. State*, 871 S.W.2d 894, 896–97 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). These are simply some factors that may circumstantially establish the sufficiency of the evidence to prove a knowing "possession," but they are not a litmus test. *Evans*, 202 S.W.3d at 162 n.12. Each case must be examined on its own facts. *Roberson*, 80 S.W.3d at 736.

### 3. Sufficient Evidence to Support Jury's Verdict

Here, the logical force of the evidence supports the determination by the jury, as the exclusive judge of the credibility of the witnesses, that Bishop possessed the methamphetamine found in the mobile "one-pot" methamphetamine lab discovered in the bed of his truck. Many of the "links" found in this case indicate that Bishop knowingly possessed the methamphetamine. *Roberson*, 80 S.W.3d at 735.

Although the lab was not in "plain view," the cardboard box wherein the lab existed was in plain view in the back of Bishop's truck. Testimony from numerous law enforcement agents indicated that the nature of the lab found would have required someone to "burp" the bottle containing the pressurized chemical reaction. Bennett testified that the mobile lab emitted a "strong burning odor" that made his nose and throat sore and made his lips feel chapped. The logical force of these facts demonstrates that Bishop was aware of the lab in the bed of his truck. The laboratory was conveniently accessible to Bishop and was found in a place owned and controlled by Bishop. In fact, Mabry required Bishop's consent to search the truck after learning from Ray that Ray did not own

20

the truck and did not feel that he could consent to the search. The lab was found "in a [truck] driven by the accused." *Roberson*, 805 S.W.3d at 735 n.2. The lab was found in the enclosed space of a cardboard box, which was within the enclosed space of the bed of Bishop's truck. Bishop's conduct of immediately turning away from the officers when he saw them and precariously crossing the street against traffic indicates that he possessed a consciousness of guilt. *See Kirk v. State*, 421 S.W.3d 772, 781–82 (Tex. App.—Fort Worth 2014, pet. ref'd) ("Flight is circumstantial evidence from which a jury may infer guilt."). Bishop's relationship with Ray was that they were cousins and that they had traveled together to Texas from Michigan in order to make money. And the amount of liquid containing methamphetamine found in the cardboard box, more than fifty-four grams, is large enough to indicate that Bishop knew of its existence.

We hold that the evidence and the logical conclusions based on that evidence support the jury's verdict that Bishop maintained control over the methamphetamine that the officers found in the mobile methamphetamine lab found in his truck. *Roberson*, 80 S.W.3d at 735. We overrule Bishop's third issue.

## IV. CONCLUSION

Having overruled all three of Bishop's issues, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

21

PANEL:  DAUPHINOT, GARDNER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 10, 2015